**EASTPORT STEAMSHIP COR-
PORATION**

v.

**The UNITED STATES.**

No. 74-55.

United States Court of Claims.

Feb. 17, 1967.

T. S. L. Perlman, Washington, D. C., for plaintiff, J. Franklin Fort, Washington, D. C., attorney of record. Michael Joseph, Washington, D. C., of counsel.

Anthony W. Gross, Washington, D. C., with whom was Asst. Atty. Gen., Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

DAVIS, Judge.[*]

In 1946, in the train of World War II, the United States was offered some former German merchant vessels as part of reparations. Despite some initial misgivings that the Maritime Commission already had enough American-built surplus vessels to dispose of, the Commission ultimately agreed with the Department of State to accept thirteen of these ex-German ships on the understanding that they would be used by American operators under the American flag and would not be sold on the world market. Eleven vessels were offered for sale, including the *Empire Roding* (which came to plaintiff and was renamed the *Eastport*). The Commission's invitation for bids, as modified, provided that the purchasers would be barred from selling the ships or operating them prior to documentation under the American flag. Plaintiff's president specifically inquired whether there would be any restriction on a later sale foreign.

The Commission's reply was that any application for such a sale would have to be considered under Sections 9 and 37 of the Shipping Act [1] and that no prior assurance could be given.

Five bids were received for the *Empire Roding*. The high bidder (offering $425,000) conditioned its bid on the Commission's agreeing to a transfer to the Danish flag immediately after American documentation. This qualification was unacceptable and the bid was rejected. The next highest bidder, which did not wish to accept more than two of the four vessels on which it bid, was allocated two other ships and its proffer of $190,300 for the *Empire Roding* was set aside. Plaintiff then became the higher offeror and received the vessel in April 1947 for $130,750 in cash.

At considerable cost the ship was altered and converted to meet the requirements of American documentation. She was then put to sea and pursued a disastrous career until plaintiff finally gave

---

[*] We are indebted to Trial Commissioner W. Ney Evans for his opinion, prepared at the direction of the court. We reach the same harbor but primarily through a different channel.

1. The pertinent part of Section 9, as amended, as it currently appears in 46 U.S.C. § 808 (1965 Supp.) is as follows:

"Every vessel purchased, chartered, or leased from the Secretary shall, unless otherwise authorized by the Secretary, be operated only under such registry or enrollment and license. Such vessels while employed solely as merchant vessels shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein.

"Except as provided in section 1181 of this title, it shall be unlawful, without the approval of the Secretary of Commerce, to sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, or transfer or place under foreign registry or flag, any vessel or any interest therein owned in whole or in part by a citizen of the United States and documented under the

laws of the United States, or the last documentation of which was under the laws of the United States."

Section 37, 46 U.S.C. § 835 (1964), provides as follows in pertinent part:

"When the United States is at war or during any national emergency, the existence of which is declared by proclamation of the President, it shall be unlawful, without first obtaining the approval of the Secretary of Commerce:

"(a) To transfer to or place under any foreign registry or flag any vessel owned in whole or in part by any person a citizen of the United States or by a corporation organized under the laws of the United States, or of any State, Territory, District, or possession thereof; or

"(b) To sell, mortgage, lease, charter, deliver, or in any manner transfer, or agree to sell, mortgage, lease, charter, deliver, or in any manner transfer, to any person not a citizen of the United States, (1) any such vessel or any interest therein, or (2) any vessel documented under the laws of the United States, or any interest therein, or (3) any shipyard, dry dock, shipbuilding or ship-repairing plant or facilities, or any interest therein; * * * *"

The quoted sections are substantially identical with those appearing in the 1946 edition of the U.S. Code.

up in June 1949 and placed her in lay-up awaiting sale. From May 1948, when it realized she was a "lemon", plaintiff made strenuous but unsuccessful efforts to sell her domestically. In June 1948 the company turned to the foreign market.

Sale alien, plaintiff knew, would require the Commission's permission, and preliminary conferences were held with the agency's staff to sound out the possibilities. Other purchasers of the ex-German vessels were having comparable difficulties, and the problem of this group of ships had been mooted before the Commission. In the first part of 1948 it had denied some applications to transfer formerly German ships to Panamanian registry and flag without change in American ownership. In October 1948, the Commission rejected a similar recommendation of its staff as to three other such ships. On February 18, 1949, at the request of some of the owners, the Commission held an open hearing on the subject of whether to permit the foreign sale of this ex-German group.

One week before this hearing (i. e. on February 11, 1949), plaintiff concluded a contract for the sale of the *Eastport* to a Danish buyer for $560,000, conditioned upon the seller's obtaining Commission approval within three months. The application for approval was filed on February 24, 1949. When the three-month period neared its close without Commission action, plaintiff made efforts to have its request disposed of within the time limit, and also obtained, as a last resort, a two-week extension from the Danish purchaser (from May 11 to May 25, 1949). The extended deadline passed without affirmative action by the Commission [2] and the Danish firm canceled the contract.

Months later, at the end of December 1949, after a sharp fall in the world market price, plaintiff contracted to sell the *Eastport* to an Israeli corporation for the lower price of $375,000 (and also subject to Commission approval of the foreign transfer). In March 1950 the Commission approved this application upon payment by plaintiff of "the sum of $10,000 as consideration for the release of the * * * *Eastport* from United States flag operation." This condition was imposed under a policy, first formally adopted by the Commission in June 1949, of requiring owners of ex-German vessels to pay a monetary sum (differing with the individual ship) for the release of the vessels from the requirement of restricted operation.

■ In a series of cases this court has held that monetary conditions, such as these, for permission to transfer a vessel are unlawful and beyond the Commission's authority under Section 9 of the Shipping Act. Clapp v. United States, 117 F.Supp. 576, 127 Ct.Cl. 505 (1954), cert. denied, 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658; Suwannee S.S. v. United States, 279 F.2d 874, 150 Ct.Cl. 331 (1960); Seatrade Corp. v. United States, 285 F.2d 448, 152 Ct.Cl. 356 (1961). Those claimants were allowed to recover the amounts illegally exacted.

Plaintiff's petition in this court sought (in count II) return of the $10,000 it was required to pay upon the approval of its sale to the Israeli company. In count I plaintiff sought damages for the Commission's earlier failure to approve the potential sale to the Danish buyer. After the decisions in the three cases referred to above, plaintiff moved for summary judgment.[3] On June 6, 1962, we granted the motion as to count II, gave judgment

---

2. On May 18th the Commission directed its staff to submit a factual memorandum as to each company which had purchased ex-German vessels and desired to sell or transfer foreign.

3. Suit was begun here in 1955. When the petition in Seatrade Corp. v. United States, 285 F.2d 448, 152 Ct.Cl. 356, was

filed a few months later, by the same attorneys, the present case was put over in the belief that the decision in *Seatrade* would control the disposition of the instant case. *Seatrade* was decided January 18, 1961. See 285 F.2d 448, 152 Ct. Cl. 356. On September 8, 1961, plaintiff filed its motion for summary judgment.

for $10,000 on the authority of the prior decisions, but denied the motion as to count I, returning the case to the trial commissioner for further proceedings. Eastport S.S. v. United States, 157 Ct.Cl. 802. We are now concerned, after a trial,[4] with the claim for damages, as set forth in count I.

The gist of that grievance is that in the spring of 1949 the Commission deliberately withheld its consent to the foreign sale and transfer of the *Eastport* to the Danish buyer while the agency was secretly formulating an illegal policy of selling such approvals for money, and that this conduct gives rise to an action for damages, cognizable in this court, for loss of the Danish contract which expired for lack of Commission consent in May 1949.

The trial commissioner examined at length the factual underpinning of this claim and made several findings favorable to plaintiff (although he ultimately decided against recovery). These findings are vigorously contested by defendant all along the line. We do not determine these factual issues because we believe that, even if the facts are assumed for present purposes to be with plaintiff, it does not state a cause of action upon which this court can grant any further relief.

**I**

 Section 1491 of Title 28 of the United States Code allows the Court of Claims to entertain claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort". But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money.[5] Within that sphere, the non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation. In the second group, where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum. See South Puerto Rico Sugar Co. Trading Corp. v. United States, 334 F.2d 622, 626–627, 167 Ct.Cl. 236, 244–245 (1964), cert. denied, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965).

In the former class fall, among many others, tax refund suits and the claims by purchasers of ex-German vessels for the sums exacted by the Maritime Commission which were returned in Clapp v. United States, supra, and in the first decision in this case (Eastport S.S. v. United States, supra).[6] We have referred to

4. Pretrial proceedings were initiated in August 1962. Difficulties, due to lack of understanding, ensued in obtaining compliance with pretrial orders pertaining to examination and audit of voyage accounting. Many months were consumed in the effort to avoid the necessity for an audit of voyage accounting in the course of trial. The trial itself, in 1964, required months to complete (although days only were required to record the testimony).

5. We put to one side the possible applicability of the Declaratory Judgment Act, 28 U.S.C. § 2201.

6. Other such cases are A. H. Bull S.S. v. United States, 108 F.Supp. 95, 123 Ct.Cl. 520 (1952); Pan American World Airways, Inc. v. United States, 129 Ct.Cl. 53, 122 F.Supp. 682 (1954); Gmo. Niehaus & Co. v. United States, 153 F.Supp. 428, 432, 139 Ct.Cl. 605, 612 (1957); Zavodny v. United States, 152 F.Supp. 432, 139 Ct. Cl. 533 (1957); and Rough Diamond Co.

these cases as those in which "the Government has the citizen's money in its pocket" and the claim is "to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute" (Clapp v. United States, supra, 117 F.Supp. at 580, 127 Ct.Cl. at 512, 513) (see, also, Pan American World Airways, Inc. v. United States, supra, 122 F.Supp. at 683, 129 Ct.Cl. at 55); and we have held that "suit can be brought in this court to recover [such] exactions said to have been illegally imposed by federal officials (except where Congress has expressly placed jurisdiction elsewhere)." South Puerto Rico Sugar Trading Corp. v. United States, supra, 334 F.2d at 626, 167 Ct.Cl. at 244.

The second category includes the varied litigations in which we are urged to hold that some specific provision of law embodies a command to the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet. Familiar examples are inverse eminent domain by a taking without formal proceedings (United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); a suit by a separated reserve officer for disability retired pay (Lemly v. United States, 75 F.Supp. 248, 109 Ct.Cl. 760 (1948)); an action for back pay occasioned by a wrongful dismissal from the civil service (Elchibegoff v. United States, 106 Ct.Cl. 541 (1946), cert. granted, 329 U.S. 704, 67 S.Ct. 187, 91 L.Ed. 613 (1946), cert. dismissed, 329 U.S. 694, 67 S.Ct. 629, 91 L.Ed. 607 (1947)); or a claim for compensation for flood damage authorized by statute (United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950)). See, also, United States v. Central Eureka Mining Co., 357 U.S. 155, 162–165, 169–179, 78 S.Ct. 1097, 2 L.Ed. 2d 1228 (1958); Bell v. United States,

366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961). In this type of case, we have held, "a claimant who says that he is entitled to money from the United States because a statute or a regulation [or the Constitution] grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous but arguable." Ralston Steel Corp. v. United States, 340 F.2d 663, 667, 169 Ct.Cl. 119, 125 (1965), cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723.

■ Monetary claims which cannot be brought within these limits [7] are beyond this court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation. This is the reverse of saying that this court is not concerned with any and all pecuniary claims against the Federal Government, simply because they rely upon (and in that sense are "founded upon") an aspect of federal, constitutional, statutory or regulatory law. Where the claimant is not suing for money improperly exacted or retained (the first class defined above), the historical boundaries of our competence have excluded those instances in which the basis of the federal claim—be it the Constitution, a statute, or a regulation—cannot be held to command, in itself and as correctly interpreted, the payment of money to the claimant, but in which some other principle of damages has to be invoked for recovery. A federal criminal defendant, for instance, who has been invalidly convicted or deprived of his liberty because of a violation of the Constitution or an Act of Congress cannot obtain compensation under 28 U.S.C. § 1491 for his loss (although remedies may occasionally be available under the unjust conviction sections (28 U.S.C. §§ 1495, 2513) or some parts of the civil rights legislation). The provisions which void

v. United States, 351 F.2d 636, 173 Ct.Cl. 15 (1965), cert. denied, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966). There are many others. Contrast Catalina Properties, Inc. v. United States, 166 F. Supp. 763, 143 Ct.Cl. 657 (1958).

7. And which do not fall under another head of jurisdiction, such as a contract with the United States.

the conviction do not direct the payment of damages for the consequences of the illegality. Under Section 1491 what one must always ask is whether the constitutional clause or the legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained. If not, this court cannot give relief under Section 1491, although some separate general principle—arising, for example, from tort law—might lead to a remedy in another forum or under some special relief provision.

Since plaintiff has already recovered the money (i. e., $10,000) illegally exacted, its present claim must be that Section 9 of the Shipping Act, on which it primarily rests its case, grants it compensation for the business loss it incurred.[8] On its face the section is simply a regulatory measure (comparable to many another permission or license-granting statute) forbidding foreign sale of a vessel purchased from the Maritime Commission—unless the Commission sanctions the sale—and requiring Commission authorization for any foreign transfer. There is not a word in the text suggesting that the United States will compensate an applicant who suffers a business loss because of the Commission's improper failure to grant the request. Nor are we pointed to anything in the Act's legislative history hinting at that result. There is no decision of this or any other

federal court holding or intimating that the United States will be liable under the Tucker Act for such a commercial injury resulting from a failure or wrong done in the course of the regulatory process. We would have to break entirely new and treacherous ground to find in Section 9 an implied directive to allow such compensation.

We decline to take that giant step. In its relevant aspects Section 9 does not differ from the licensing or permission-granting authority of numerous other federal agencies—the Atomic Energy Commission, Civil Aeronautics Board, Civil Service Commission, Comptroller of the Currency, Federal Aviation Agency, Federal Communications Commission, Federal Home Loan Bank Board, Federal Power Commission, Federal Reserve Board, Interstate Commerce Commission, Securities and Exchange Commission and the Tariff Commission. If we were to infer from Section 9 an unexpressed summons to compensate plaintiff for its business loss, we would necessarily have to open the doors to similar claims by other applicants who suffer commercial damage from a wrongful denial of a license or permission by these other agencies (or as a result of the agency's improper refusal to act).[9] More than that, we would be hard put to give a preferential reading to these license-authorizing statutes—implying compensation for this particular type of business injury—over the

**8.** On this phase of the case, *Clapp, Suwannee, Seatrade* and the earlier *Eastport* decision are beside the point. The issue there was the recovery of sums illegally exacted. Here the question is the plaintiff's right to compensation for business damage suffered because of its inability to follow through on the Danish transaction.

**9.** Section 9, as applied here, does not differ in any meaningful way from the other license-type provisions. Plaintiff says it is significant that the Commission's wrongful conduct was part of an effort to extract money. But the money has already been recovered, and we fail to see how the fact that the wrong was of that nature can affect the separate claim for damages for a business loss which could

just as well have occurred if the Commission's failure to approve the Danish sale had stemmed from some other improper motive or condition. The important factor is the existence of administrative error or wrong leading to injury, not the specific character of the particular defect. Plaintiff has also said that Congress has established special statutory methods for correcting the errors of other agencies, but not those made by the Commission under Section 9. The premise is not wholly accurate, but even so these statutory methods of review do not deal with monetary compensation but merely allow correction of the error in precisely the same way that our 1962 decision in this case corrected the Commission's error by returning the $10,000 exacted from plaintiff for the Israeli sale.

mass of other regulatory and prohibitory activities of the Federal Government (including criminal prosecutions) which can and do cause pecuniary loss if improperly conducted—personal, property, and business loss which up to now has not been redressed through this or the district courts. The same principles to which the present claimant appeals would also call for a drastic extension of federal liability to all of these fields. A wholly new ground of obligation would be summarily created by mere implication from statutes which say nothing to suggest such pecuniary responsibility.

Yet Congress has thus far been very careful, whenever it has dealt with the regulatory area, not to go that far. Not only is the mass of regulatory legislation (including Section 9) entirely silent on the subject of compensation for loss due to erroneous or wrongful regulation. Congress has always withheld from this court and from the Tucker Act original jurisdiction over tort claims against the Government (Gibbons v. United States, 75 U.S. (8 Wall.) 269, 274–275, 19 L.Ed. 453 (1868); Langford v. United States, 101 U.S. 341, 25 L.Ed. 1010 (1879); Bigby v. United States, 188 U.S. 400, 23 S.Ct. 468, 47 L.Ed. 519 (1903); J. Ribas y Hijo v. United States, 194 U.S. 315, 323, 24 S.Ct. 727, 48 L.Ed. 994 (1904); and liability for damages occasioned by wrongful regulatory action [10] smacks more of tort than of non-tortious obligation.

 Above all, when the Federal Tort Claims Act (now 28 U.S.C. §§ 1346, 2680) was passed, Congress specifically exempted injuries traceable to performance of a "discretionary function". Section 2680(a) excepts from coverage:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not

such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Dalehite v. United States, 346 U.S. 15, 26–30, 32–34, 35–38, 73 S.Ct. 956, 97 L. Ed. 1427 (1953), makes it absolutely plain that the Maritime Commission's function in acting under Section 9 was discretionary and that there would be no liability under the Tort Claims Act even if the agency abused its discretion (as plaintiff asserts).[11] The discretion protected by § 2680(a) "is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law." Id. at 34, 73 S.Ct. at 967. "Where there is room for policy judgment and decision there is discretion." Id. at 36, 73 S.Ct. at 968. And "it is clear that the * * * clause as to abuse connotes both negligence and wrongful acts in the exercise of the discretion * * *. The exercise of discretion could not be abused without negligence or a wrongful act." Id. at 33, 73 S.Ct. at 967. The legislative history of the Tort Claims Act fully and specifically supports these holdings. Id. at 27–30, 73 S.Ct. 956. The House Committee, for example, said over and over again that the "discretionary function" exception was "also designed to preclude application of the bill to a claim against a regulatory agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved." Id. at 29, 73 S.Ct. at 964 n. 21.

 In the face of this persistent refusal by the federal legislature to per-

---

10. I. e., damages other than recovery from the Government of the claimant's money or property which has been improperly taken or retained.

11. In this respect *Dalehite* has not been modified or qualified by any subsequent decision of the Supreme Court.

mit damage claims against the United States resulting from wrongful regulatory activity, we cannot read into Section 9 of the Shipping Act any implied direction to compensate plaintiff.[12] To do so, we would be supported neither by the text of the section, nor by its context, legislative background, or past-enactment history. At the same time we would be ignoring the uniformly stony face Congress has turned toward a judicial remedy for this kind of business injury. If plaintiff had sued under the Tort Claims Act, its action would undoubtedly have fallen afoul of Section 2680(a), the "discretionary function" exception. If the suit in this court had asserted, without relying directly on Section 9 as the basis of the claim, a wrongful refusal by the Maritime Commission to approve the transfer, the petition would clearly have to be dismissed as a demand, founded in tort, for business damages due to misconduct. See Part II, infra. We cannot evade these barriers by incorporating into Section 9 something which is not there, either in terms or by fair implication—a mandate for compensation.[13] Rather, we must follow the admonition of the Supreme Court, almost a century ago, "to be cautious that we do not permit the decisions of this court to become authority for the righting, in the Court of Claims, of all wrongs done to individuals by the officers of the General Government, though they may have been committed while serving that government, and in the belief that it was for its interest. In such cases, where it is proper for the nation to furnish a remedy, Congress has wisely reserved the matter for its own determination. It certainly has not conferred it on the Court of Claims." Gibbons v. United States, supra, 75 U.S. (8 Wall.) at 275–276.[14]

II

Secondarily, plaintiff bases its claim on the Constitution, on the existence of an actual contract to consider its application for foreign transfer, on a novel variant of the doctrine of "pendent jurisdiction", and on the clause of 28 U.S.C. § 1491 referring to damages not sounding in tort. We find these grounds equally without merit.

 There was no taking requiring compensation under the Fifth Amendment. Neither the plaintiff's ship nor its contract with the Danish buyer was appropriated. Omnia Commercial Co. v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923). The Commission's role was simply part of a pre-existing regulatory process known to plaintiff from the time it purchased the *Eastport*, and the Commission's failure to give its approval within the necessary time took no property from plaintiff any more than a comparable failure by the Federal Trade Commission, the Securities and Exchange Commission, or the Federal Power Commission, in their administrative processes, would amount to a taking. Cf. United States v. Central Eureka

---

12. "The naming of certain exceptions in [the Tort Claims Act] does not serve to confer on this court jurisdiction of the exceptions unless those exceptions are such that the court would have jurisdiction of the subject matter by virtue of 28 U.S.C. 1491." Hacker v. United States, 109 F.Supp. 392, 395, 124 Ct.Cl. 261, 265, (1953).

13. In its motion for summary judgment filed in 1961, but not in its current presentation, plaintiff cited the Administrative Procedure Act as a statute on which its present claim is founded. The considerations we have discussed with respect to Section 9 apply as well to the Procedure Act. That legislation has never been considered as according monetary compensation to persons who have been hurt by a failure to follow its prescriptions, and, just as with Section 9, to imply such liability would thrust an unintended burden on the Federal Government which Congress has not yet agreed to assume.

14. Since plaintiff's claim that Section 9 grants it the right to compensation is not frivolous, we hold, not that the court is without jurisdiction, but that on the merits the statutory argument is erroneous. Cf. Ralston Steel Corp. v. United States, supra, 340 F.2d at 666–669, 169 Ct.Cl. at 123–128.

Mining Co., supra, 357 U.S. at 165–166, 168–169, 78 S.Ct. 1097.

■ Nor has plaintiff proved the breach of a contract with the United States which it alleged in its motion for summary judgment in 1961.[15] We agree with the trial commissioner when he said: "Plaintiff, it will be recalled, inquired of Maritime, before submitting its bid, whether the sale would carry a restriction against foreign transfer or sale at some later time, and Maritime replied, in effect, that there would be no restriction other than the consideration normally applied to section 9 applications. Plaintiff would ascribe to this exchange of telegrams a significant role in the negotiation of the contract of sale. It is not so entitled, in my opinion, since the essence of Maritime's reply was only that it would obey the law in relation to applications for section 9 approvals. Whatever may have been plaintiff's need for reassurance on this point, the assurance when given was only what plaintiff had a right to assume in the first place and was not a part of the contract negotiations." There was no contract with the Commission with respect to a sale alien, but merely an ordinary declaration by the agency that it would consider such an application under the law, as it had to do.[16]

■ Plaintiff also invokes Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), and the uncertain doctrine of "pendent jurisdiction". See, also, United Mine Workers of America v. Gibbs, 383 U.S. 715, 722, 86 S.Ct. 1130, 16 L.Ed.2d 218 ff. (1966). The argument is that, since the court has already entertained and granted the claim for the return of the $10,000 exaction, we ought also to consider and decide the present claim (even though we would not otherwise consider it) because it stems, in plaintiff's view, from the same illegal determination of the Commission to exact a money payment as a condition to any foreign sale of the *Eastport*. Whatever the role "pendent jurisdiction" may play for this court

---

15. It is noteworthy that in its earlier *per curiam* opinion in this case, 157 Ct.Cl. 802, 803 (1962), denying the motion as to count I and remanding that claim for further proceedings, the court characterized count I as seeking "judgment for damages of $283,950 for alleged breach by defendant of a contract to consider plaintiff's application for the transfer of its ship SS *Eastport* from American to foreign ownership and flag."

16. We also agree in general with the trial commissioner's statement:

"Neither does misrepresentation, or something akin to breach of warranty by Maritime, based upon its failure when the time came to obey the law [as the trial commissioner found, but which the court does not reach] afford a base for alleged breach of duty under the facts as found. When Maritime advised plaintiff that there would be no restriction against foreign transfer or sale at some later time other than considerations normally applied to section 9 applications, it did not state the whole case. At that time (December 1946) the Commission considered itself morally bound by the commitment that had been given to the Reparations Agency to require operation of the ex-German vessels under the American flag and not to permit them to find their way into the world market. The first applications for section 9 approvals pertaining to these vessels were denied on this ground. Maritime's position in this respect was not made known to plaintiff until June 1948, more than a year after plaintiff acquired the ship. At that time, it did represent an exception withheld by Maritime in December 1946, ostensibly in the belief that plaintiff already knew of it, which plaintiff did not.

"Eight months later, in February 1949, when plaintiff found a foreign buyer, the situation had changed and the Commission was no longer basing its position with respect to section 9 applications upon the commitment to the Reparations Agency. By that time, Maritime was engrossed with the problem of what relief to grant and upon what terms. Under such circumstances, any semblance of misrepresentation by the Commission in failing to apprise plaintiff of its position in relation to the reparations commitment had lost its relevancy. Absent a material misrepresentation, Maritime's subsequent failure to perform its duty under the law [see above] warrants a characterization other than breach of warranty."

(cf. Marine Transport Lines, Inc. v. United States, 139 F.Supp. 301, 135 Ct.Cl. 874 (1956), cert. denied, 352 U.S. 935, 77 S.Ct. 227, 1 L.Ed.2d 163), it is clear that the two separate counts in the plaintiff's petition did not involve "the violation of a single right" (289 U.S. at 246, 53 S.Ct. at 590) or "arise out of the same transaction" (139 F.Supp. at 302, 135 Ct.Cl. at 876). The $10,000 payment was connected with the sale to the Israeli buyer in late 1949 and early 1950, while the present claim stems from the aborted contract with the Danish firm in the spring of 1949. These were "two separate and distinct causes of action" (289 U.S. at 246, 53 S.Ct. at 589), and did not have to be resolved in the same proceeding. Moreover, it is hard to see how "pendent jurisdiction" could lead this court to decide a case which *no* court, state or federal, could entertain. On this phase of its argument plaintiff must assume that its claim is founded in tort; but Congress has withheld this kind of tort action from all federal courts, and state courts would obviously be powerless. For us to consider the cause of action would not be to save time or trouble, or to eliminate duplicate litigation, but to decide a claim, under the camouflage of "pendent jurisdiction", which no court has the right to decide.

▇▇▇ It is also said, finally, that this is a claim "for liquidated or unliquidated damages in cases not sounding in tort" (28 U.S.C. § 1491). We need not now explore the full shape of that still-amorphous and unfamiliar part of our jurisdiction, for plaintiff's present claim —if it is not validated by a statute, the Constitution, or a contract (as we have already held in this opinion)—must be tortious. What is asserted is wrongful conduct by the Maritime Commission, breaching its legal duty to plaintiff, which led to a business loss through failure of the Danish contract. This could be called interference with plaintiff's rights under the Danish contract, or a breach of legal duty independent of any agreement between plaintiff and the Commission, or unjustified conduct (negligent or intentional) causing injury under the *prima facie* theory. Whatever the characterization, the gravamen of the cause of action, under normal legal theory, would be tortious as between private parties. We must apply the same standards. The whole history of federal consent-to-sue on tort claims, as well as the structure of the Tort Claims Act (especially the exceptions (28 U.S.C. § 2680 (a)–(n)), demonstrates that Congress has thought of cases "sounding in tort" as those which would be tort-grounded as between private persons.

### III

▇▇▇ Even if we were to decide (contrary to our holdings in Parts I and II, supra) that plaintiff could maintain in this court a claim for loss due to the Commission's withholding of approval under Section 9 while it was formulating an illegal policy of exacting money as a condition of approval, we could not grant judgment to plaintiff on this record. One reason is that the Commission was under no obligation to pass upon plaintiff's application within the three months allowed by the Danish contract. In the realm of administrative determination, that is a relatively short period; it would not be unreasonable or unprecedented for the Commission to take more time. We cannot say, no matter what the considerations flowing through the Commission's collective mind, that it breached any duty to plaintiff when it failed to act upon the application within the short time allowed by the Danish contract. See Seatrade Corp. v. United States, supra, 285 F.2d at 450, 152 Ct.Cl. at 360 (four month delay). Even if, as the trial commissioner thought, the delay here was founded upon a determination to consummate an illegal exaction from the shipowners, the agency would not commit an abuse of discretion, or violate a duty owed to plaintiff, until it sustained its refusal to act for a period which could objectively be deemed unusually long—and three

months would not be such. It is the length of the delay, not the Commission's secret motivation alone, which makes the difference.

■ A separate ground for refusing recovery—the basis on which the trial commissioner ultimately rested—is that we cannot say that the Commission would have granted approval even if it had not been improperly motivated.[17] The Commission had not obtained the views of the other interested departments and agencies as to the effect of the pending Danish sale upon the national defense, the foreign policy, or the commerce of the United States, nor had the Commission made any determination as to the need for the *Eastport* in the United States merchant marine. Not even a preliminary survey had been made; the whole matter still lay within the agency's broad discretion. Cf. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 317–318, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958). The trial commissioner was unable to say that approval would have been granted if the illegal factor had been excised—and we agree. It may be that approval would have been denied outright, or the Commission might have imposed legal conditions which would be unacceptable to plaintiff or its customer. These were not mere theoretical possibilities, but live alternatives. There is too much speculation and conjecture in making the necessary judgment that approval would have been given flatly or on tolerable terms.[18]

For these reasons, plaintiff is not entitled to prevail on count I of its petition and that count is dismissed.

---

17. Assuming , of course, that in fact it was moved, while plaintiff's application was pending, by the illegal desire to obtain a money payment.

18. The two surviving commissioners testified at the trial, in substance, that if plaintiff's application had come to a vote before June 1949 they would have voted to deny it. From April 11, 1949 to June 6, 1949 there were only four commission-

ers in office. The trial commissioner found (and we concur) that, if plaintiff's application had come before the Commission for a vote prior to the consummation of an arrangement satisfactory to the Commission as between it and Seatrade Corporation, plaintiff's application would have been denied. The agreement with Seatrade was not fully approved until June 24, 1949, about a month after plaintiff's Danish contract finally expired.