**MITKOF LUMBER COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–345C.**

United States Claims Court.

June 14, 1991.

---

Gregory J. Miner, Portland, Or., for plaintiff. Alan I. Saltman, John J. Fausti and Ruth G. Tiger, Washington, D.C., of counsel.

Vincent B. Terlep, Jr., with whom were Asst. Attys. Gen., Stuart B. Gerson and David M. Cohen, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Pending is defendant's motion to dismiss count VIII of the complaint, as amended, or in the alternative, for summary judgment on that count. In count VIII, plaintiff claims that the Forest Service violated section 4 of the Federal Timber Contract Payment Modification Act (the "Modification Act"), 16 U.S.C. § 619 (1988) ("section 4"), and failed to provide the relief statutorily mandated thereby. The motion raises three questions in connection with the Modification Act: 1) whether section 4 reasonably can be construed as "money mandating"; 2) if it can, whether the Forest Service's discretion under section 4 can be reviewed by this court; and 3) assuming such review, whether plaintiff is entitled to recover under count VIII. After oral argument, and for the reasons which follow, the court concludes that section 4 of the Modification Act is money mandating, that the agency's exercise of its discretion is subject to a limited review, but that plaintiff is not entitled to a recovery. Accordingly, count VIII will be dismissed.

## BACKGROUND

Mitkof Lumber Company, Inc. was awarded a short-term timber contract by

the United States Forest Service in 1983, by the terms of which Mitkof was to pay the equivalent of $86.23 per thousand board feet ("MBF") of timber in the Tongass National Forest in Alaska. The parties refer to this as the "Fritter contract." The sale was made pursuant to the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub.L. No. 96–487, 94 Stat. 2371 (1980).

Of the total price per MBF, $7.06 was to be cash, and $79.17 was to be provided in the form of road construction. Of the $7.06 to be paid in cash, $6.75 consisted of a base rate per MBF for the timber on those tracts. The base rate is an established rate below which a bid may not be accepted by the Service.[1] In addition, Mitkof bid an additional $.31 per MBF in cash. If roads were built according to Forest Service design, they would have furnished the equivalent of $79.17 per MBF or a total of $2,039,972 in credit toward payment due under the contract. The Forest Service later exercised its right to recalculate the cost of road construction during the contract period, however, and the potential credit dropped to $64.68 per MBF. Without access roads, the timber in the Fritter contract could not be harvested.

The prospectus prepared by the Forest Service on the Fritter sale indicated that the advertised rates (same as base rates in this case) were substantially below the anticipated costs of road construction. The prospectus warned bidders that if an "insufficient value of timber is indicated after including the bid premium ..., the Forest Service WILL NOT OFFSET THE DEFICIT WITH CONTRIBUTED FUNDS (CASH OR MATERIALS)." In this respect the contract was distinct from some others entered into by Mitkof. In the Granite sale, for example, awarded in October, 1981, the prospectus provided that "[i]f an insufficient value of timber is still indicated after including the bid premium following sale award, Forest Service shall offset the deficit in whole or in part by providing contributed funds."

The reference in these prospectae to contributed funds is to monies made available by Congress under section 705(a) of ANILCA. 16 U.S.C. § 539d. By that provision, Congress "authorize[d] and direct[ed] that the Secretary of the Treasury shall make available to the Secretary of Agriculture the sum of at least $40,000,000 annually or as much as the Secretary of Agriculture finds is necessary to maintain the timber supply from the Tongass National Forest...." *Id.* Such funds were made available by the Forest Service to reimburse contractors for the cost of road construction when it was in excess of rates contracted to be paid for stumpage.

Timber prices collapsed in the Northwest and Alaska during the 1980's, leaving companies holding timber sale contracts with the obligation to purchase large quantities of timber at above-market values. In order to provide relief, Congress adopted the Modification Act. During the legislative process, attention was also focused on the particular circumstances of holders of short-term contracts in Alaska. Holders of long-term Alaska contracts were protected from large price drops by standard contract provisions requiring rate redeterminations every five years. Short-term contract holders such as Mitkof, however, were not similarly protected. In order to provide relief, and to make short-term contracts competitive with long-term contracts, Congress adopted section 4 of the Modification Act, referred to generally as the Emergency Rate Redetermination provision ("ERR"). This section was inserted late in the legislative process, during floor debate, and thus comes with little legislative gloss and no committee reports. The amendment was introduced in the Senate by Senator Hatfield, on behalf of the Senators from Alaska. The brief discussion during debate suggests that section 4 has the particularized purpose of equalizing the position of holders of short-term Alaskan timber contracts with that of holders of long-

---

1. In other words, bidders on the Fritter sale were free to submit a bid equaling or exceeding

an average of $6.75 per MBF.

term contracts.[2]

Section 4 provides the following:

(a) Application; applicable period. Emergency stumpage rate redetermination shall be made upon the written application of the purchaser of National Forest timber in Alaska, bid after January 1, 1974, and rates established as a result thereof shall be effective for timber scaled during a period between January 1, 1981, and five years from October 16, 1984.

(b) Competitive effect of modification of contracts. In making the emergency rate redeterminations the Secretary [of Agriculture] may modify existing contract terms, including the amount of the bid premium, in order to provide rates which will permit the holders of contracts bid after January 1, 1974, to be competitive with other purchasers of National Forest timber.

(c) Excepted contracts. The provisions of this section shall not apply to contracts held by the holders of 50–year timber sale contracts in Alaska.

16 U.S.C. § 619.

The Forest Service adopted final regulations to implement section 4 on July 31, 1985. They are, in relevant part, the following:

(a) Eligible contracts.... All other holders of closed and current timber sale contracts in Alaska bid between January 1, 1974, and July 31, 1985, ... are eligible for emergency rate redeterminations under this section.

(b) Application. Purchasers must make written application for emergency rate redeterminations to the Contracting Officer. The Contracting Officer will make emergency stumpage rate redetermination on eligible contracts....

(c) Modification of existing contracts. If necessary to provide for rates that are competitive with other purchasers of national forest timber in Alaska, the Forest Service may modify existing payment terms of contracts eligible under paragraph (a), including reduction of bid premiums and the reduction of established base rates.

. . . .

(e) Refunds. If the Contracting Officer determines that, as a result of an emergency rate redetermination, the credit balance of a timber sale account exceeds the charges for timber estimated to be cut in the next 60 calendar days, the Forest Service upon the purchaser's request, may refund the cash portion of such excess that is attributable to the redetermined contract rates.

36 C.F.R. § 223.183 (1986).

In adopting these regulations, the Forest Service rejected comments received from two respondents to the proposed regulations suggesting that the modification of existing contract terms "should also include the modification of required road standards, manipulation of cutting area boundaries, and the changing of various contractual requirements." 50 Fed.Reg. 30,935 (1985). The Service responded that "the Act does provide for discretionary modification of existing contract terms; however, such modifications are limited to those relating to rates to be paid for timber." *Id.*

On August 30, 1985, Mitkof's Forester wrote the Tongass National Forest Supervisor requesting "[r]eappraisal and reduction of the timber to base rates" pursuant to the statute and regulations, with respect to the Fritter sale. The President of Mitkof, Donald P. Ford, has submitted an affidavit, however, in which he states that the

---

**2.** *See* 130 Cong.Rec. S11,892–94 (1984) (statements of Sens. Stevens, Hatfield and Symms); 130 Cong.Rec. H10,539, H10,548 (1984) (statements of Reps. Strangeland and Young).

During debate in the House on the Senate bill, Rep. Young of Alaska made the following statement in support of the ERR:

The Alaska provision in this act equitably allows the smaller timber operators who compete with the holders of long-term contracts to renegotiate with the Forest Service the price they have been paying for timber. Because of the legal contracts signed by the holders of long-term contracts, they now have negotiated the price of their timber according to the market conditions, which are even worse for Alaskan pulp timber than they are for Pacific Northwest timber.

130 Cong.Rec. at H10,548.

company orally requested of Forest Service officials that the contract be modified with respect to road building requirements; specifically, that the Government assume responsibility for building roads or paying for roads built by Mitkof.[3]

Mitkof received an emergency rate redetermination, but the redetermination lowered only the cash portion of the consideration from $7.06 per MBF to $1.67, which became the new base rate. The minimum amount that Mitkof was obligated to pay in cash was thus reduced by $5.39 per MBF. Mitkof's obligation to absorb the cost of putting in roads was unaffected, and it proceeded to build the roads and harvest the timber.[4]

Purchaser road credits are described in 36 C.F.R. § 223.62 (1985): "'[P]urchaser credit' for road construction ... shall, when such construction is accomplished by the purchaser, be deducted from stumpage payments made by or due from purchaser under the timber sale contract for other than minimum stumpage rates and required deposits...." The net result of plaintiff's success in getting a reduction in stumpage rates under section 4 was thus that its road construction credits were made ineffective. That is, they exceeded rates to be paid for the stumpage. Mitkof had to pay cash for the reduced base rates, and there were no charges against which to offset the value of the road construction.

While the balance of the complaint raises issues under the Contract Disputes Act,[5] count VIII asserts a right to money damages from section 4 of the Modification Act. Plaintiff contends that it should be paid over two million dollars as compensation for roads it had to build.[6]

## DISCUSSION

The defendant initially moved to dismiss for lack of jurisdiction, on the ground that the statute at issue should not be construed to create a substantive right to receive money damages. Because section 4 did appear to create the possibility of money compensation, the court earlier converted the defendant's motion to dismiss for lack of subject matter jurisdiction into a Rule 56 motion for summary judgment, and invited plaintiff to provide further legal and factual support for its claim, which it has done. Additional consideration of section 4 persuades the court that its earlier instruction to the parties was correct.

█ This court has jurisdiction under the Tucker Act[7] to award money damages pursuant to a statute, if the statute in question can be fairly construed, by express language or by implication, to mandate the payment of money.[8] In such a circumstance, the court's jurisdiction derives from the Tucker Act, while the substantive right

---

3. Defendant has not challenged the latter assertion, but points out that under the circumstances, the regulations require such a request to be in writing in order to be granted. It does not seriously press the point, however, since counsel candidly admitted that it has located a letter dated January 27, 1988 in which the President of Mitkof requests "augmentation" of the contract by Forest Service monies, presumably pursuant to ANILCA, to pay for road construction under the Fritter contract.

4. The affidavit of Gary Peterson, timber valuation group leader for the Forest Service in the Alaska Region, recites that the road credit provisions were also adjusted as a result of the emergency rate redetermination. With no explanation, Peterson states that the estimated road construction credit that could be earned was reduced from $79.17 per MBF to $64.68 per MBF. Apparently this was a result of an allowable reassessment of anticipated construction costs. Plaintiff has not challenged this state-

ment, and it does not appear to affect the outcome.

5. 41 U.S.C. §§ 601–613 (1988).

6. Paragraph 54 of the amended complaint recites:

> Mitkof did not receive the full benefit intended under the Act, because in implementing the Act, the Forest Service reduced only the cash portion of the consideration to which it was otherwise entitled from Mitkof on Fritter. In so doing, the Forest Service ignored one of the fundamental premises underlying Mitkof's Fritter contract.

7. 28 U.S.C. § 1491(a)(1) (1988).

8. *United States v. Mitchell*, 463 U.S. 206, 211–19, 103 S.Ct. 2961, 2964–69, 77 L.Ed.2d 580 (1983); *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967).

comes from the statute relied upon.[9] If the statute is money mandating, the subsequent inquiry is whether the complaint states a claim upon which relief can be granted. As the Court of Claims held in *Ralston Steel Corp. v. United States*, 169 Ct.Cl. 119, 124–25, 340 F.2d 663, 667, *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965), "If the plaintiff asserts that his claim 'arises under' or is 'founded' on federal legislation or regulation [citations omitted] '[t]o determine whether that claim is well founded,' the court 'must take jurisdiction, whether its ultimate resolution is to be in the affirmative or the negative.'" *Id.* 169 Ct.Cl. at 125, 340 F.2d at 667 (quoting *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951)).

To similar effect is *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967); the analysis of which was adopted by the Supreme Court in *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). The court focused the jurisdictional inquiry narrowly. It was sufficient to invoke Court of Claims jurisdiction if the claimant said he " 'is entitled to money from the United States because a statute or a regulation [or the Constitution] grants him that right, in terms or by implication ... at least if his claim is not frivolous.'" *Eastport*, 178 Ct.Cl. at 606, 372 F.2d at 1008 (quoting *Ralston*, 169 Ct.Cl. at 125, 340 F.2d at 667).[10]

In the second, or substantive stage of its analysis, however, the court in *Eastport* focused on whether section 9 of the Shipping Act suggested that the Government would compensate an applicant for failure to permit sale of a vessel. The court concluded that it did not:

There is not a word in the text suggesting that the United States will compensate an applicant who suffers a business loss because of the Commission's improper failure to grant the request. Nor are we pointed to anything in the Act's legislative history hinting at that result. There is no decision of this or any other federal court holding or intimating that the United States will be liable under the Tucker Act for such a commercial injury resulting from a failure or wrong done in the course of the regulatory process....

.... In its relevant aspects Section 9 does not differ from the licensing or permission granting authority of numerous other federal agencies.... If we were to infer from Section 9 an unexpressed summons to compensate plaintiff for its business loss, we would necessarily have to open the doors to similar claims by other applicants who suffer commercial damage from a wrongful denial of a license or permission by these other agencies (or as a result of the agency's improper refusal to act). [Footnote omitted.] More than that, we would be hard put to give a preferential reading to these license-authorizing statutes ... over the mass of other regulatory or prohibitory activities of the Federal Government....

178 Ct.Cl. at 608–09, 372 F.2d at 1009–10.

In *Mitchell*, the Supreme Court concluded that a series of statutes and regulations relating to the management of Indian timber lands created a cause of action in members of the Quinnault Indian Tribe for money damages for breach of trust. In reaching this conclusion, the Court drew on *Eastport* and *Ralston* to frame the inquiry as "whether [the statutes or regulations at issue] can fairly be interpreted as mandating compensation for the damages sustained [as a result of a breach of the duties

9. *United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983); *Ralston Steel Corp. v. United States*, 169 Ct.Cl. 119, 126 n. 5, 340 F.2d 663, 668 n. 5, *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965).

10. This reference in *Ralston* to the claim not being frivolous has been misconstrued by plaintiff to mean that any non-frivolous assertion of a statutory right to recovery entitles the plaintiff to relief. Satisfying this relatively low threshold inquiry merely gives access to the court. It does not answer the substantive inquiry of whether the plaintiff is actually entitled to relief.

they impose]." *Mitchell*, 463 U.S. at 218, 103 S.Ct. at 2968.

These cases thus suggest a two-step analysis. If the claim that the statute can be fairly construed to mandate the payment of money is not frivolous, jurisdiction attaches. If there is jurisdiction, the inquiry then becomes whether the circumstances and the entity involved are within the coverage of the statute.

The court is satisfied that the Tucker Act has been properly invoked. The first paragraph of section 4 of the Modification Act mandates that the Secretary must redetermine stumpage rates upon written application of a qualifying purchaser. 16 U.S.C. § 619(a). The legislative history of the Modification Act,[11] including section 4,[12] makes clear that Congress was concerned about the economic impact of elevated contract prices on an industry that it viewed as at risk. As the regulations themselves make clear, the combination of a rate redetermination with the congressional instruction that a redetermination can be retroactive means that refunds were contemplated. Indeed the regulation specifically makes allowance for return of monies. *See* 36 C.F.R. § 223.183(e) (1986).

There is also no question that section 4 of the Modification Act was intended to create an economic benefit for entities in

the class of Alaska timber producers holding short-term contracts, such as Mitkof. The court therefore concludes that Mitkof's contention that section 4 is, at least by implication, money mandating is sufficiently "non-frivolous" that the court's jurisdiction is properly invoked.

■ The fact that the precise relief to be afforded is left somewhat to the discretion of the Secretary, does not, as defendant suggests throw jurisdiction into question. It is true that the second paragraph of section 4 authorizes, but does not direct, the Secretary to adjust any contract term in achieving a redetermination of rates, including the amount of the bid premium. 16 U.S.C. § 619(b). Defendant draws from this that section 4 of the Modification Act cannot be construed as mandating the payment of compensation because paragraph (b) is written in permissive terms: the Secretary "may modify existing contract terms." In the court's view, however, so long as section 4 as a whole plainly contemplates the potential for money payments to qualifying applicants, the issue of discretion goes to the following substantive issues: what is the character of the benefit mandated by the statute, i.e., do the circumstances alleged by plaintiff put it in line for money relief, and, to what extent is the Secretary's exercise of discretion entitled to deference? [13]

---

**11.** The purpose of the Modification Act was to provide financial relief to the timber industry, particularly in the Western states, since they are heavily dependent on timber from the public lands. It was estimated that if all timber purchasers were to perform under then-current contracts, they would have lost nearly $4 billion. S.Rep. No. 596, 98th Cong., 2d Sess. 4–5, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3796, 3797.

**12.** *See supra* note 3.

**13.** The Government points out that the distinction between permissive language, "may," and peremptory language, "shall," has been relied upon by the Federal Circuit in distinguishing whether a statute is one that gives rise to an action to compel payment. It points to the decision in *Grav v. United States*, 886 F.2d 1305 (Fed.Cir.1989). While that decision is helpful to the analysis here, it is important to note that the issue in that case was different than the one posed by the defendant's present motion.

The court in *Grav* was dealing with a claim under the Dairy Production Stabilization Act of 1983, 7 U.S.C. § 1446(d) (1988). Under one paragraph of that statute, like the one at bar, the Secretary of Agriculture was given discretion to modify contracts between the Department of Agriculture and milk producers upon certain determinations. 7 U.S.C. § 1446(d)(3)(E) (Supp. I 1983). By distinction, the statute separately directed that the Secretary "shall ... offer to enter into a contract ... with any producer of milk in the United States for the purpose of reducing the quantity of milk marketed by the producer for commercial use during the fifteen month period beginning on January 1, 1984." 7 U.S.C. § 1446(d)(3)(A) (Supp. I 1983). The legislative history also suggested that the Secretary "must" offer to enter into contracts with producers in order to reduce the quantity of milk marketed. *Grav*, 886 F.2d at 1308. The trial court in *Grav* had denied a government motion to dismiss, finding that the act compelled the Government to contract with a qualifying producer. 14 Cl.Ct. 390, 392 (1988). The precise

The second issue will be addressed first, since it goes to the nature of the court's review. The complaint does not call on the court to second-guess the agency's exercise of its judgment in applying the regulations to facts particular to a single contractor. If that were the case, the court would be ill-equipped to determine whether the agency's discretion was properly exercised. *See Pope v. United States*, 9 Cl.Ct. 479, 485 n. 3 (1986). Here, however, the gravamen of the claim is that the agency erred as a matter of law in failing to apply the statute to an entire category of contracts. Plaintiff contends that Congress expected section 4 to be implemented by the Forest Service in such a way that no distinction would be made between consideration in the form of cash or in the form of road construction. From this Mitkof concludes that it is enough to bring a successful action to assert that the Secretary as a matter of policy chose not to assume responsibility for road construction. As to relief, Mitkof contends that the "full benefit" of the act mandates compensation for the entire cost of its road building, $2,030,-972.

■ In the court's view, the discretion granted to the Secretary is reviewable under the present circumstances only to the extent of determining whether the Forest Service erred as a matter of statutory interpretation in treating road credits differently than cash payments, or whether the Service's decision to make that distinction was arbitrary or capricious. Having concluded that the statute entitles entities within its purposes to compensation, the agency may not construe the statute in such a way as to deprive those entities of its intended benefit. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Gross v. United States*, 205

Ct.Cl. 605, 618, 505 F.2d 1271, 1279 (1974); *Associated Milk Producers v. United States*, 22 Cl.Ct. 682, 685 (1991); *Parks v. United States*, 15 Cl.Ct. 183, 189–90 (1988); *see also Robbins v. Reagan*, 780 F.2d 37, 45 (D.C.Cir.1985) (Department of Health and Human Services decision not to fund a homeless shelter was reviewable. The "clear statutory guidelines" could be gleaned from the legislation by "a Congressional intention to pursue a general goal."); *Allison v. Block*, 723 F.2d 631, 637–38 (8th Cir.1983) (the court will not decide the manner in which the Secretary must develop standards applicable to the statute, but will intervene if the Secretary has not chosen a process of reasoned decisionmaking to safeguard against an abuse of discretion).

■ The parties agree that the purpose of Congress in adopting section 4 was to assist holders of short-term contracts by giving them the same benefit available to the two long-term contract holders—periodic rate redeterminations. This is confirmed by the express language of section 4 itself, which provides that redeterminations are to "permit the holders of contracts bid after January 1, 1974, to be competitive with other purchasers of National Forest Timber." 16 U.S.C. § 619(b). It also provides that "this section shall not apply to contracts held by the holders of 50–year timber sale contracts in Alaska." 16 U.S.C. § 619(c). It is therefore important, in addressing plaintiff's argument that the Forest Service has misconstrued or arbitrarily applied section 4, to fix precisely how Mitkof was treated in comparison with other contract holders, both short-term and long-term.

From the Forest Service materials supplied by the parties, it is clear that the large majority of short-term contracts were the subject of substantial relief. By retroactively as well as prospectively reducing base rates, monies had to be paid back, and larger amounts were in effect forgiven as

holding of the trial court, however, was that an implied in fact contract was created by the plaintiff's application for participation in the program. The statute constituted an offer, and the producer's application constituted accept-

ance. The court was then left with the issue of determining the terms of the contract. The holding in *Grav* can thus be viewed as addressing a question of contract formation, and is therefore not directly on point.

to future payments. There is no question that as to several of its contracts, Mitkof was one of the contractors getting that type of relief. The Peterson affidavit refers to 11 Mitkof contracts as to which rates were redetermined. Six of those did not involve road construction credits, and as to those contracts, Mitkof was forgiven up to 98 percent of the stumpage rates it bid. Mitkof has furnished documentation strongly suggesting that contractors which were committed to paying exclusively in cash received price redeterminations that typically reduced the total payments per MBF by over 90 percent.

The Fritter sale falls within the remaining types of contracts. Mitkof points out that as to the Fritter sale, the consideration it had to furnish was reduced only five percent, since it was still required to build and pay for the roads in order to access the timber. It is apparent, however, based on the commentary to the section 4 regulations and the defendant's submissions that Mitkof's treatment as to the Fritter sale was not unique. The Forest Service, as a matter of policy, chose not to treat road credits as part of the rates to be redetermined under the ERR provisions. Therefore, regardless of whether or not this policy is consistent with the statute or arbitrary for other reasons, Mitkof cannot claim to have been singled out. Other contracts involving purchaser road credits were treated in a similar fashion.

Since short-term contracts requiring the construction of roads did not receive relief in the form of an assumption of road construction responsibility by the Government, the question is whether long-term contract holders were being treated better in that respect. They were not. There were apparently only two companies with long-term sales contracts in the Tongass National Forest. Peterson asserts, without contradiction from Mitkof, that the Forest Service did not furnish funds to those contracts to help pay for road construction costs after timber rates were reduced. For example, a long-term contract held by the Ketchikan Pulp Corporation in the Tongass National Forest went from an advertised rate of $73.17 per MBF, of which $29.03 was road credits, to a redetermined rate of $3.07 in cash and road credits of $36.80.

A recent decision of the Agriculture Board of Contract Appeals reached a consistent result. The case concerned a request by Alaska Lumber & Pulp Company, the other holder of long-term contracts, for relief from a contract provision making it liable, at a minimum, for base rates, plus the cost of logging and road construction. *Alaska Lumber & Pulp Co.*, Nos. 83–301–1, 84–351–1, 1991 WL 49978 (AGBCA Mar. 29, 1991). There was no provision in the contract for recovery of road costs in excess of a bid premium. As a result of rate redeterminations similar to those in the case at bar, Alaska Lumber's road credits were rendered ineffective. Because those road credits had not been amortized over the life of the contract but had been utilized up front, the Forest Service attempted to recoup over $6 million from the appellant.

The issue before the Board was one of contract interpretation, primarily, the definition of effective purchaser credit. The contract is different than the one at bar, and thus the case is not directly on point. As Mitkof correctly points out, appellant there was trying to make road credits effective for later use in the contract. By rejecting Alaska Lumber's proffered interpretation, however, the timber company was placed in a situation similar to that faced by Mitkof. Stumpage rates were reduced, road credits were rendered ineffective, and Alaska Lumber was left with the obligation to absorb road construction costs. The fact that Mitkof affirmatively seeks a cash payment from the Forest Service to "augment" the contract, while Alaska Lumber sought to preserve credits for future use is a distinction with no practical difference for purposes of determining whether the intent of section 4 was fulfilled.

It is difficult, in view of the clearly expressed legislative intent, for Mitkof to argue that it did not get the complete relief directed by section 4. On its face, section 4 did not require the Forest Service to give a rate redetermination in any particular way.

It specifically authorized the modification of bid premiums, which occurred in Mitkof's case, but made no specific mention of non payment-rate terms, such as road construction credits.

There are two strong indicia that Congress did not have such relief in mind. During the floor debate in the Senate, Sen. McClure of Idaho announced that he had planned to offer an amendment to the legislation that later became the Modification Act to deal with "the problem of ineffective purchaser road credits." 130 Cong.Rec. S11,887 (1984). He proceeded to outline a problem facing contractors obligated to construct roads and who are then faced with an inability to offset those road credits against bid premiums. *Id.* at 11,887–88. The difficulties he outlined with respect to road construction were broader than those addressed in Mitkof's present complaint, but plainly encompass them. A fair reading of Sen. McClure's comments, as well as the responses of his colleagues, *id.* at 11,-889, 11,893, make it plain that the floor managers did not believe that section 4 would address problems with ineffective road credits.

Plaintiff's own behavior confirms this construction. In its written request for a rate redetermination under section 4, it made no mention of road credits. It was only in a separate, subsequent letter of January 27, 1988 that it requested "augmentation" of the contract with Forest Service funds. Use of the term augmentation, as well as the letter's reference to General Accounting Office decisions concerning Mitkof's Granite sales contract, make it clear that the request was not made pursuant to the Modification Act, but under ANILCA. It was similarly not unreasonable for the Forest Service to deal with requests for augmentation to compensate for ineffective road construction credits only under ANILCA. Congress had explicitly set aside a minimum of $40 million per year for that purpose, and as discussed above, had indicated through the floor debate that the Modification Act would not address road construction credit problems.

Mitkof builds much of its argument that Congress contemplated more broad ranging relief on a single newspaper article. The Ketchikan Daily News of October 5, 1984 quoted the Forest Service's Director of Timber Management: "[T]he prime Alaska beneficiaries of the bill are Mitkof Lumber Company ... [and three other companies].... [The cost of section 4] could go up to $50 million at its highest level." Plaintiff draws great comfort from these comments because the Forest Service has only paid out a fraction of that amount. If road construction costs could be assumed under section 4, the potential cost would approximate $50 million. The most that can be gleaned from this single statement, however, is that one Forest Service official was afraid that passage of the Modification Act would cost the Service $50 million, much of which would consist of road construction costs that theretofore were to be absorbed by contractors.

The court declines to give any interpretive weight to this statement. It was made prior to the time the Modification Act became law and, presumably, in the hope of influencing Congress or the President to reject the legislation. There is no indication that Congress adopted this analysis. It is also unreliable, appearing as it does only in a newspaper. Moreover, it merely purports to express one official's view. Obviously that view did not prevail at the regulation-making level.

As has been recently confirmed by the Supreme Court, the construction of a statute by the agency charged with its implementation is entitled to great deference. In *Rust v. Sullivan,* —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) the Court noted:

In determining whether a construction is permissible, "[t]he court need not conclude that the agency construction was the only one it could permissibly have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.*, 467 U.S., at 843, n. 11, 104 S.Ct., at 2782, n. 11. Rather, substantial deference is accorded to the interpretation of the authorizing statute by the

agency authorized with administering it. *Id.*, at 844, 104 S.Ct., at 2782.

*Id.* 111 S.Ct., at 1767 (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Here, the most generous reading of section 4 from plaintiff's standpoint is that it does not speak to whether the Forest Service should amend the contract terms to either pay for previous road construction, or assume the responsibility for paying for future road construction. Given the unambiguous discussion about section 4 on the Senate floor, the accomplishment of rough parity with the long-term contract holders, and the existence of separate legislation specifically addressing government absorption of road construction costs, the court concludes that plaintiff has not demonstrated, given the deference to which the Forest Service's construction is due, that a policy of not adjusting road construction credits under section 4 was erroneous.

### CONCLUSION

While section 4 of the Modification Act can reasonably be construed to mandate the payment of money, the Forest Service's implementation of that section to preclude assumption of road construction costs was not inconsistent with its language or purpose. Count VIII of the complaint is dismissed.