**NL INDUSTRIES, INC.**

v.

**The UNITED STATES.**

No. 229–83C.

United States Claims Court.

May 22, 1987.

**392**

Herbert L. Fenster, Washington, D.C., for plaintiff; David A. Churchill, Tami Lyn Azorsky, and McKenna, Conner & Cuneo, of counsel.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant; David M. Cohen, Director, Dept. of Justice.

## OPINION

YANNELLO, Judge.

The complaint in this case essentially alleges two causes of action, one based on an alleged taking under the fifth amendment and one on an alleged breach of contract. The issue presently before the court concerns defendant's motion to dismiss the taking claim for failure to state a claim. (A separate motion, filed February 1986 addresses plaintiff's claim founded on contract and has not yet been argued before the court.)

This court is aware of the many decisions admonishing courts to examine each case on an ad hoc basis and, further, advising that such examinations are usually very fact-intensive and rarely capable of resolution by dispositive motion. In the instant case, all of the complex factual background is stipulated and there are no disputes of material facts for the purpose of the pending motion. In that motion, defendant has suggested that notwithstanding all the facts as alleged by plaintiff, NLI's complaint fails to set forth, as a matter of law, a claim for compensable taking. The court now addresses that motion given the particular factual circumstances here present.

### I. *Statement of Facts*

The background facts, not in dispute, are set forth in full in the opinion (including Appendix) issued this date in *Allied General Nuclear Services (AGNS), et al. v. United States*, 12 Cl.Ct. 372, to which the instant case is related; these facts are incorporated by reference, and will not be fully restated, herein. (To the extent that issues of jurisdiction discussed in *AGNS* are also applicable here, they are incorporated by reference.)

It suffices to say here that, since the early 1950's and the enactment of the Atomic Energy Act of 1954 (the "AEA"), 42 U.S.C. §§ 2011–2282 (1976 and Supp. V. 1981), the government, through appropriate agencies (including the, now, Nuclear Regulatory Commission (NRC)), has encouraged private enterprise to enter into the nuclear fuel and nuclear power industry. The extent of the government encouragement, exhortation, and inducement directed toward private enterprise in this regard is described in full in the *AGNS* appendix and is, for the purpose of the instant motion, deemed to be established.[1]

Part of that industry, with which we are not now concerned, involves utility plants using nuclear power to generate power. These plants use fuel containing nuclear components such as plutonium, which is also a component of nuclear weaponry. At the end of the fuel cycle, the spent fuel, which contains quantities of nuclear components, may be either disposed of or reprocessed.

The central focus of this case is the reprocessing of spent fuel, which has been encouraged by the government inasmuch as such recycling reduced the need for uranium by the utility plants and reduced the disposal of waste, containing nuclear material, from the utility plants. (The related *AGNS* case referred to above concerns chiefly the construction and operation of a reprocessing plant.)

A transportation system was also an integral part of the chain between the utility plants and the reprocessing plants (and presumably, of the waste disposal process as well).[2] Such transportation system is of particular importance in the instant case involving plaintiff NL Industries (NLI). In connection with the pending motion to dismiss, many of the facts are taken from the complaint and are presumed to be established for the purposes of the motion.

---

1. With the passage in 1970 of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, environmental concerns also were a factor in the nuclear power industry, but, for the most part, these concerns are not at issue here.

2. A waste disposal program is presumably necessary either for the non-reprocessed spent nuclear fuel from the utility plants or the waste by-products of the recycling process (which would contain less nuclear material than the non-reprocessed spent nuclear fuel.) *See also* the recent Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.* This aspect of the industrial chain, like the utility plants themselves, is not involved in either the *AGNS* or *NLI* cases.

In order to induce private investment, the government entered into contracts with the utility companies to provide the "back-end" of the fuel cycle, *i.e.* use government facilities to receive spent fuel—with financial settlements with the utilities, and to provide reprocessing and transportation services until these were available from private commercial facilities. (These contracts are not at issue here.)

NLI became involved in the nuclear industry in the late 1950's, when it designed and manufactured lead cask transportation systems for nuclear submarine cores on behalf of the United States Navy's nuclear submarine program. NLI was also the first company to ship irradiated fuel from Canada to and from research reactors throughout the country. NLI had been targeted by the Government as an excellent potential candidate to design and manufacture transportation systems for spent nuclear fuel.

In 1968, the government's agency issued reports estimating that the volume of spent fuel to be transported through 1980 was $25 to $30 million, or, alternatively, that shipping costs by the year 2000 would be between $136 and $202 million. This report also stressed the need for commercial involvement in the transportation of spent fuel in order to complete the fuel cycle, and noted that NLI's predecessor was one of only three companies in the United States that had the capability to design and fabricate spent fuel shipping containers.

In 1971, AGNS, having previously received a construction permit from the government, began construction of a reprocessing plant (known as Barnwell or BNFP). At that time, NLI entered into an agreement with AGNS to design and supply the entire transportation systems for the reprocessing facility.[3] All components of this transportation system were required, by statute, to be certified and licensed by the government.

NLI owned a plant in Wilmington, Delaware, where transportation systems were fabricated. Fabrication of a transportation system was begun in 1973. By 1977, NLI had invested $15.5 million in the design, licensing, labor and materials relating to the transportation systems for Barnwell and had completed manufacturing five truck systems and two rail systems, with raw material on hand to build several additional systems.

For ease of reference in the discussion below, plaintiff's plant, together with its equipment, completed inventory of truck and rail systems as described above, work-in-progress, raw materials, and the licenses granted by the government to NLI with respect to such transportation systems, shall all be referred to as either "physical property" or "realty" or "real property".

By 1977, the government had issued certificates of compliance for NLI's rail and truck systems, which were in conformity with all relevant licenses and permits issued by the government (and which satisfied the terms of NLI's contract with AGNS). Moreover, the transportation system itself was specifically approved by the government. Thus, NLI had met the statutory regulatory requirements, and was prepared to furnish the needed transportation system to AGNS, or to any other licensed reprocessing plant.

Accordingly, NLI was not directly *involved* in subsequent events concerning the licensing procedures for the reprocessing plants themselves. However, inasmuch as NLI provided an integral service in the chain of the nuclear power industry, particularly in the reprocessing of spent nuclear fuel, it was directly *affected* by the results of those procedures which would permit reprocessing plants to operate.

NLI, like the plaintiff in *AGNS*, focuses on the events of 1977. These events include an announcement by President Carter, who expressed concern over proliferation of nuclear materials and weapons, particularly in the context of international

---

**3.** The parties apparently entered into a letter of agreement and, as defendant acknowledges for purposes of the pending motion, plaintiff's allegation that it had a contract with AGNS is accepted as fact.

relations and foreign policy.[4] The President stated that the government would defer indefinitely the commercial reprocessing and recycling of the plutonium produced in domestic nuclear power programs, and that AGNS's Barnwell plant would receive neither federal encouragement nor funding for its completion as a reprocessing facility.[5]

Of more immediate interest is the government's concomitant imposition, in 1977, of a moratorium (which the plaintiff characterizes in its complaint as an indefinite suspension or a termination) in the proceedings concerning AGNS's application for a license to operate the Barnwell reprocessing facility. (For a fuller discussion, *see also* the Appendix to the opinion in *AGNS*.) Plaintiff alleges that this action effectively dismantled the entire private nuclear fuel reprocessing industry.[6]

Plaintiff contends that this termination of the industry in turn rendered plaintiff's property entirely valueless, thereby effecting a taking thereof, under the fifth amendment, for which just compensation is due.[7]

The plaintiff has essentially described four items of property allegedly taken:

1. Physical property (or real property as described above) including its truck and rail systems and its fabrication plant.
2. Rights under a contract with AGNS.
3. Rights under a contract with the United States.
4. Investment-backed expectations in the existence of a long-term market for transporting spent nuclear fuel for the reprocessing industry.

Plaintiff's allegations are set forth in the complaint.

Defendant, in a motion to dismiss for failure to state a claim upon which relief can be granted, argues that as a matter of law, there can be no claim upon which relief can be granted for a taking under the facts as alleged, for a variety of reasons discussed below. The pending motion assumes that the allegations set forth in the complaint are fact and contends that, even based on such facts, no claim has been stated.[8]

---

4. *See also* the Nuclear Non-Proliferation Act of 1978.

5. The President's 1977 announcement had no direct impact upon the statutory regulatory process, since the President did not directly administer that process. However, as chief executive, the President's position led indirectly to action by the executive agency which administered that process, causing it to alter its policy and modify its proceedings accordingly.

6. A discussion of the moratorium appearing in *Westinghouse Electric Corp. v. United States*, 598 F.2d 759 (3d Cir.1979), and summarized in the Appendix to the *AGNS* opinion, suggests that the moratorium was permissible under the statute, but only for a limited duration. (This might raise in any subsequent further proceedings in this case, the question of whether any alleged taking was of a permanent or temporary nature. *See, e.g., United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455 at n. 6, 88 L.Ed.2d 419 (1985)).

Nonetheless, plaintiff NLI alleges that, as a result of the termination of deliberations concerning applications for licenses to operate the reprocessing plant, "there was simply no remaining market for spent fuel transportation". Complaint, ¶ 44. Plaintiff also alleges that its physical property was taken, and was virtually unusable, "upon termination of the nuclear reprocessing industry". Complaint, ¶ 45.

In essence, plaintiff alleges that the imposition of the moratorium (that is to say, the termination of the deliberative proceedings designed to consider applications for operating permits such as that of AGNS) effectively resulted in the dismantling of the entire enterprise. Defendant's arguments in its motion are not founded on any contention to the contrary. For the purposes of the pending motion to dismiss, such allegations are accepted as fact.

7. For purposes of the pending motion only, it is assumed that the property was rendered valueless. In any further consideration of whether a taking has occurred, further proceedings will be necessary to determine whether, in fact, the plaintiff has indeed been deprived of the economically viable use of its property.

8. As the questions are now presented before this court, it may be determined, if defendant is correct, that as a matter of law no taking has been stated in the complaint for which compensation is due. The converse cannot be found, *i.e.,* that a taking, for which compensation is due, *has* occurred as alleged by plaintiff. It could only be determined, if defendant's arguments are not accepted, that the allegations of the complaint are sufficient to warrant consideration of the merits; that a compensable taking

The discussion of these contentions follows.

## II. *Discussion*

### A. *Regulatory Action: Presumption of Correctness*

■ This court lacks jurisdiction to review allegations of tortious government action or to award money for violations of general regulatory statutes, such as the AEA, which do not contain any express provision allowing for monetary damages. *See, e.g., Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 608–09, 372 F.2d 1002, 1009 (1967).

■ Accordingly, for the purpose of any taking claim in this court, the regulatory action by the government is presumed to have been authorized and to be correct within the provisions of the governing statute. *See, e.g., Florida Rock Industries v. United States,* 791 F.2d 893 (Fed.Cir.1986). Indeed, in the instant case, like the situation in *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184 (1981), the correctness of regulatory action has been specifically reviewed and affirmed, at least with respect to the imposition, in 1977, of a moratorium in the government's consideration of pending applications for operating licenses, for the purpose of completing a study which was expected within two years. (*See Westinghouse Electric Corporation v. United States,* 598 F.2d 759 (3d Cir.1979), in which the instant plaintiff, together with the plaintiff in *AGNS, supra,* joined as parties.)[9]

Thus, for purposes of this action, it is assumed that the government acted properly in its regulatory role. It is alleged, however, that even this proper exercise of authority has resulted in a taking of plaintiff's property for which it should receive just compensation under the fifth amendment.

### B. *Regulatory Action: As a Taking*

The fifth amendment provides, essentially, that private property shall not be taken for public use without just compensation. The Constitution does not further address what shall constitute a taking "for public use".

Any property owner aggrieved by governmental action, and believing such action to constitute a taking requiring just compensation, addresses his concerns in the courts, seeking redress there. *See, e.g., Monongahela Navigation Co. v. United States,* 148 U.S. 312, 327, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1982).

At one time, the courts, and particularly the Supreme Court, construed the clause as requiring just compensation only for those takings by virtue of which the United States actually physically occupied or used the property. In like vein, the courts viewed a compensable taking as having occurred when the government so used neighboring property as to virtually exclude another property owner from his own property.

With respect to plaintiff's physical or real property as described above, defendant argues that this case falls outside that category of cases where a taking "is most likely to be found" because: (1) there has been no actual physical invasion of plaintiff's property by the government; (2) there has been no use of the property by the government; and (3) there has been no

*could* have occurred and that a claim for compensable taking exists and/or is not ruled out as a matter of law. Among the many issues which have yet to be addressed are the questions concerning the diminution of the value of plaintiff's property. Therefore, this opinion addresses only the arguments raised in defendant's motion to determine whether, in law, plaintiff has for the reasons raised by the motion, failed to state a claim.

9. The study was completed in March 1980, as anticipated in the *Westinghouse* decision which referred to a moratorium of approximately two years. After issuance of that report, however, the government did not reopen or recommence the proceedings to consider pending applications for licenses to operate reprocessing plants, such an application by AGNS being then pending, nor did the applicant AGNS seek such reopening. (As will be discussed in greater detail below, NLI did not require any license other than that which it had already received, and thus played no direct role in the proceedings which had been suspended.) In any event, for purposes of a taking claim asserted in this court, the government action must be deemed appropriate and correct.

exclusion of plaintiff from its property. (Moving brief, pages 37–43.) The factors listed by defendant may be construed as the "basic" elements deemed necessary to constitute a compensable taking of the most common type and under what might be termed the earlier or more traditional view.

■ We reject defendant's contention, however, and note the now well-established doctrine, by which we are bound, and which might perhaps be termed the modern view, that government action (including the implementation of its police power in protection of the public) can, in appropriate circumstances, constitute a taking even though the elements cited by defendant are absent.

For example, in *Deltona*, 228 Ct.Cl. at 486, 657 F.2d at 1190 (1981), the Court of Claims stated:

> It is well established as a matter of law that government regulation can effect a Fifth Amendment taking. *See, e.g., Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123 [98 S.Ct. 2646, 2658, 57 L.Ed.2d 631] (1978) (no taking found on the specific facts of that case); *Benenson v. United States*, 212 Ct.Cl. 375, 388, 390, 548 F.2d 939, 947, 948 (1977) (taking found). The rationale, as stated by Justice Brennan, is that "[p]olice power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property." *San Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 652, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting). [Footnote omitted.]

In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), the Supreme Court recently stated:

> As has been admitted on numerous occasions, "this court has generally 'been unable to develop any "set formula" to determine when "justice and fairness" require that economic injuries caused by public action'" must be deemed a compensable taking [compensated by the government, rather than remaining disproportionately concentrated on a few persons.] The inquiry into whether a taking has occurred is essentially an "ad hoc, factual" inquiry. The court has, however, identified several factors that should be taken into account when determining *whether a governmental action has gone beyond "regulation" and effects a "taking"*. Among these factors are: "the character of the governmental action, its economic impact, and its interference with reasonable investment backed expectations." [Citations omitted.] [Emphasis supplied]

*See also Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1558 (Fed.Cir.1985); *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) and *MacDonald, Sommer & Frates v. Yolo County, et al.*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986).

Thus, the court concludes that regulatory action of the type here involved may, as a matter of law, constitute a compensable taking, under the Fifth Amendment, even though the action lacks the elements stressed by defendant.

## C. Property Generated Under Existing Regulatory Scheme

### 1. Generally

Defendant also contends that plaintiff's allegations fall short of stating a claim for compensable taking because the regulatory system, under which the alleged taking occurred, was in place at the time plaintiff acquired or developed its property interests. (Indeed, absent the AEA and attendant regulations, there would be no private nuclear power industry into which plaintiff might enter.) Thus, contends defendant, the consequences of regulatory action were known to plaintiff and/or were foreseeable; plaintiff, choosing to proceed subject to such regulatory system, should bear the burdens and risks of any losses occasioned by the implementation of that system.

The contentions of the parties in this regard actually raise two issues, one factual and one a matter of law.

The first issue is factual, namely, whether the actual regulatory action beginning in 1977 was foreseeable at the time plaintiff generated or acquired its property interests, given the technology and state of the world at the time of such acquisition. To this extent, defendant can point to no failing or deficiency in plaintiff's allegations.

Indeed, plaintiff asserts that it neither knew nor could have foreseen the intervention of concerns for international nuclear proliferation in the determinations concerning the future of the domestic nuclear reprocessing industry. Moreover, plaintiff alleges that only the government was in a position to evaluate such concerns and it divulged no information during the long periods of plaintiff's investment in the industry. Further, plaintiff alleges that the government, although initially aware of the possibility of nuclear proliferation, did not consider this a concern in furthering the domestic nuclear reprocessing industry. (*See, e.g.,* Complaint, ¶¶ 16, 22, 23, 33.) In its briefs, plaintiff contends that the actions of the government, while consonant with the statute's requirement that deliberations on license applications include consideration of the public health and safety and common defense and security, were nonetheless a total, and unpredictable, reversal of previous government policy.

For the reasons set forth below, however, this court does not view these factual allegations, even if established at trial, as determinative of the issue.

The second issue is one involving primarily a question of law. In essence, the argument advanced is that no compensation is due for any taking (by regulatory action) of property which is acquired while the regulatory system is in effect and which is thus subject thereto. Under this theory, it would be irrelevant whether the regulatory action (beginning in 1977 and allegedly accomplishing a taking) resulted from known (and foreseeable) or unknown (and unforeseeable) developments or advances in technology, the state of the art, the state of the world, or otherwise.

■ After examining these factual and legal issues, this court subcribes to the view that the matter is subject to resolution primarily as a matter of law. It is the very existence of the regulatory scheme which is, as a matter of law, dispositive of the matter. So long as regulatory action (of whatever nature) is contemplated, it does not matter whether the events which give rise thereto were or should have been foreseen by the property owner when acquiring or generating its property interests. Changes in the state of the art, and similar changes, are always possible, and indeed, it has been said that change is inevitable. It is the existence (prior to property acquisition) of a system, whereby regulatory agencies may respond to such changes, which is determinative of the issue of foreseeability.

In this connection, it should be noted that the regulatory action here involves the implementation of jurisdiction and of substantive standards or criteria which existed at the time of property acquisition and which remained constant. *See, e.g., Westinghouse, supra.* The standards to be used in considering applications and granting permits were constant—public safety and common defense—and plaintiff has neither alleged nor shown any changes in the statute's regulatory scheme.[10] The increasing emphasis on and awareness of international nuclear proliferation, as a consideration of such standards, does not alter the pre-existing standards or scheme.[11]

---

10. For example, in considering applications to market certain drugs, the criterion for approval may be considerations of public safety. If this criterion is in existence both at the time of property acquition, there may be no claim for compensable taking. This would hold even if the regulatory action was (1) occasioned by changes in the technology of scientific testing, or by the generation or development of additional and new data or (2) occasioned by a change in the significance attached by the agency to tests or data developed earlier.

If, however, the standards of regulatory action is based on the imposition of a new standard (*e.g.,* adding efficacy as well as safety to the considerations), then the possibility of a taking may exist.

11. The parties here make only passing reference to the Nuclear Waste Policy Act of 1982 (42 U.S.C. § 10101 et seq.) but make no clear asser-

Indeed, the courts, in attempting to determine whether a compensable taking has occurred, have focussed on such elements as whether the private property owner could "claim to be surprised" by the government's exercise of its authority, or whether the possibility of government action was clearly present, or whether the party had sufficient opportunity to consider these risks. *See, e.g., Shanghai Power Co. v. United States,* 4 Cl.Ct. 237 (1983), *aff'd.* 765 F.2d 159 (Fed.Cir.1985), *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985).

There is impressive support for defendant's contention. The Court of Claims reached a similar conclusion in *Eastport,* 178 Ct.Cl. at 612, 372 F.2d at 1011–1012 (1967). There the court found that no compensable taking had occurred when the government's role "was simply part of a pre-existing regulatory process known to plaintiff from the time it purchased [the property], and the [agency's] failure to give its approval within the necessary time took no property from plaintiff any more than a comparable failure by [various named regulatory agencies]." [12]

Language in the *Deltona* decision, *supra,* also suggests support for defendant's contention, particularly the following, 228 Ct.Cl. at page 487, 657 F.2d at page 1190:

> The crucial factor in this case is that since the late 1960's the regulatory jurisdiction of the Army Corps of Engineers has substantially expanded pursuant to [the statute] and—under the spur of steadily evolving legislation—the Corps

has greatly added to the substantive criteria governing the issuance of dredge and fill permits within its jurisdiction. * * *

Moreover, when Deltona acquired the property in 1964, it knew that the development it contemplated could take place only if it obtained the necessary permits from the Corps of Engineers. Although at that time Deltona had every reason to believe that those permits would be forthcoming when it subsequently sought them, it also must have been aware that the standards and conditions governing the issuance of permits could change. Deltona had no assurance that the permits would issue, but only an expectation. * * *

*Id.* at 491, 657 F.2d at 1193.

(This was not, however, the sole basis for the court's decision.) [13]

Likewise, in *Florida Rock, supra,* the Federal Circuit continued the expression of the view which was earlier stated in *Eastport* and *Deltona* and held that a taking well may be found to have occurred, using the appropriate criteria of evaluation, where, as the trial judge found, the plaintiff need not have foreseen the statutory amendments (following plaintiff's acquisition of its property) which led to the restrictions on its use of its property.

Recently, in *Monsanto, supra,* the Supreme Court furthered this view by holding that: (1) deprivation of property rights pursuant to statutory terms in existence at the time the property was generated would not constitute a taking; whereas (2) depriva-

tion that this Act forms any basis of the present claim. Indeed, it might be argued that that statute clarifies the Congressional expression of the same types of considerations or standards of "public safety and common defense" already contained in the 1954 AEA which gave rise to the agency regulatory action already in issue here. (*See also* fn. 2 above)

12. In *Eastport,* relief for the commercial losses sustained by plaintiff was also denied for another reason. The court noted the plaintiff's allegation of wrongful or improper government action—namely, the delay by the agency in implementing the regulatory process (and in acting on plaintiff's application for a permit). The court, 178 Ct.Cl. at pages 608–09, 372 F.2d at

pages 1009–1010, found that the regulatory legislation contained no provision for monetary award in the event of wrongful government action (and thus the claim would be beyond the court's Tucker Act jurisdiction, 28 U.S.C. § 1491) and that the court did not have jurisdiction over tort claims against the government.

13. It should be noted, however, that the court, in *Deltona,* did not stop its discussion with the foregoing observation. Rather, the court proceeded to examine the extent to which plaintiff's property value had been impaired. Ultimately, the fifth amendment claim in *Deltona* was denied on the basis that while some diminution in the value of plaintiff's property had occurred, it still retained an economically viable use.

tion which is contrary to the terms in existence at the time the property is generated could constitute a compensable taking.

Thus, as a general proposition, defendant's argument is well taken and may indeed be persuasive in circumstances presenting no additional or unusual factors.

### 2. *Special Circumstances*

Plaintiff, however, points to circumstances here, perhaps somewhat unique, which would arguably alter this result. NLI points to the doctrine reiterated in *Monsanto, supra,* requiring an *ad hoc* examination of each case to determine, ultimately, whether the burden of the government's regulatory action should be borne by the public generally or by the specific property owner. In this connection, the plaintiff relies upon the fact that the government sought-out, exhorted, facilitated and induced private industry generally, and plaintiff specifically, to enter this commercial market. These facts are not disputed, and are adopted by the court, for the purposes of this motion. *See also AGNS, supra,* appendix.

Because of the nature of this argument, it is important to stress at the outset that no express or implied (in fact) contracts with the government are involved here. (While plaintiff does allege the existence of such contracts, such separate counts of the complaint are the subject of a separate motion and are not addressed herein. *See also* discussion in section E *infra.*)

The plaintiff's novel argument is not without some appeal. The enterprise involved here was not only subject to regulation but was fledgling, newly developing, and somewhat speculative, requiring extensive capital investment by private industry and involving new and highly complex technology. Moreover, as the government exhorted, it was expected to ultimately be of great benefit to the public.

■ Nonetheless, the court is not persuaded of the merit of this claim. Entrepreneurs were not compelled, under any duress, by the government to enter this market. Rather they may have been attracted by the anticipated long term growth (with attendant revenues and profits). Moreover, private industry could have refused to enter this market without certain protection.[14] In short, despite the ultimate and extensive public purpose advanced by the government, private entrepreneurs were solely responsible for their ultimate decision to participate in this market; they alone would benefit financially from success and they alone must bear the monetary losses from their investment.

### 3. *Summary*

Based on the foregoing, it is concluded generally, and as a matter of law, that the factual allegations here fall short of stating a claim for a compensable taking for various reasons: (1) the property was acquired, generated, and developed, well-within a preexisting regulatory scheme which subjected property to the possibility of the imposition of the limitations now complained of; and (2) government encouragement of plaintiff's acquisition of this property does not give rise to or provide support for a taking claim.

Additional aspects of Plaintiff's claim as to specific types of property allegedly taken are set forth below.

### D. *Plaintiff's Physical or Real Property*

As pointed out in the preceding factual statement, NLI owned physical property, including a building, inventory, work in progress, and materials. In addition, as pointed out above, NLI had obtained all licenses necessary to furnish its transportation system to any licensed reprocessing plants.

---

**14.** For example, private parties could contract to build ore processing plants for government ownership and purchase. Separate operating contracts (perhaps with stated fees) could subsequently be entered into. (Government owned-contractor operated or GOCO plants are not unheard of particularly in unique industries involving public safety or where the volume of useage is uncertain.)

Whether the government would have entered into such contracts is unknown but industry was free to abstain from entering this field of commerce except upon such terms as it felt afforded adequate protection.

NLI expected to provide services to AGNS, in pursuance of which expectation NLI entered into a contract with AGNS and made a considerable capital investment in the construction of its transportation system. Moreover, NLI was encouraged by the government to anticipate a large reprocessing industry—with growth throughout the remainder of this century—in pursuance of which anticipation NLI dedicated its plant; the design and construction of an acceptable transportation system, in consultation with the government; and the obtaining of necessary licenses.

At the time of the events in issue (beginning with the Presidential announcement in early 1977), NLI had not only physical property but also all necessary licenses to enable it to provide a transportation system to the reprocessing industry. And that industry had been expected to include not only AGNS but any other reprocessor who was permitted by the government (which anticipated the growth of a rapidly expanding industry) to construct and operate a reprocessing plant. NLI had expectations, backed by considerable capital and technological investment, of exercising its rights, under existing licenses (and pursuant to the alleged contract with AGNS—the existence of which enforceable contract is presumed for the purposes of the instant motion) to provide such transportation services.

In this circumstance, NLI may be said to differ from the plaintiff in *AGNS*. Unlike AGNS, NLI had not only physical property, but the licensed right to construct and provide the transportation services to a reprocessing industry. It was the constriction of this industry by the events in issue (*e.g.*, the moratorium beginning in 1977) which, for the purposes of the instant motion, caused the alleged total loss of plaintiff's property.

Moreover, inasmuch as NLI had obtained the permission of the government as to the design and use of its transportation sys-

tem, it had (assumedly for the purposes of the instant motion) no further obligation to seek the issuance of licenses from the government. NLI had no active or direct role in the licensing procedure which affected the construction or operation of the reprocessing plants which would form an important part of the anticipated reprocessing industry.

Thus, the government's regulatory action did not directly impede plaintiff's authority or ability to design, construct, and use its property; indeed, all necessary permits had issued to NLI. Rather, the frustration of plaintiff's investment-backed expectations stemmed from the government's regulation of the primary industry (i.e., the licensing of reprocessing plants like that of AGNS), which to NLI was to provide a service.[15]

■ In addition to the reason set forth above concerning regulatory taking, this court is not prepared to extend the doctrine of "regulatory taking" so as to render compensable such indirect government action. One primary cause for this reluctance is the speculative nature of such a claim. Apart from specific contracts for services or with suppliers, the industry, even if licensed to operate, may not have availed itself of plaintiff's property for any number of reasons. For example, during the license process, AGNS, in 1980, undertook negotiations (albeit unsuccessful) to sell its plant to the government (which already owned and operated a similar, and adjacent, plant at Savannah River); whether the government, like private industry, would avail itself of NLI's services is open to question.

Here, then, plaintiff NLI is precluded from recovery for two reasons. First, as discussed above, it acquired the property, to service a regulated industry, under a pre-existing scheme which might, at any-time, withhold or revoke licenses under which the industry operated. Moreover, even apart from direct regulatory action, NLI was subject to the vagaries of the

---

**15.** To the extent that recovery may be sought for firm contracts with the industry, the matter is treated separately below.

industry itself.[16] This court is not of the opinion that recovery should lie.

### E. *Plaintiff's Contract with United States*

The third type of property identified by plaintiff, relating to its rights under a contract with the United States, was described during oral argument, pursuant to the court's inquiry, as involving a contract implied-in-fact. The existence (and breach by the government) of this contract is contained in Counts II through IV of the complaint. (In connection with this contract claim, some of the facts alleged in connection with the government's inducement of industry may again be asserted.)

The government has separately moved to dismiss the contract claim altogether (arguing, *inter alia* and at page 11 of its moving brief, that no such contract exists). That motion has not yet been ruled upon and it has not yet been determined whether there does indeed exist a contract implied-in-fact.

Again, the court recognizes that in a motion to dismiss, such as the one now pending with respect to the taking claim, the allegations of the complaint are taken as established. However, here the motion relates only to the taking claim (Count I of the Complaint) and only the factual allegations relevant to that claim are taken as established. This motion to dismiss does not assume, for its purposes, the fact of the existence of a contract implied-in-fact.

Accordingly, it is inappropriate at this time to address whether plaintiff has failed to state a taking claim with respect to such alleged contract. If and when it is determined that a contract-in-fact has been established (and the extent, if any, of the terms of such a contract), plaintiff's claim that its rights under such a contract have been "taken" may be reexamined. At that time defendant may, if it chooses, reassert any defense to a claim of taking (including reassertion of the contention that plaintiff has failed to state a claim upon which relief can be granted).

To the extent that defendant's pending motion to dismiss the taking claim may be viewed as relating to that item of property described as "rights under a contract with the United States", it is denied without prejudice as premature. (Instead, it will be considered by the court as fully briefed in connection with a separate motion now pending.)

### F. *Plaintiff's Contract with AGNS*

The plaintiff has characterized this claim as a taking or deprivation by the government of "NLI's rights under its contract with AGNS" and characterized the contract as "requir[ing] NLI to produce the transportation system ... and requir[ing] AGNS to use the system produced by NLI".[17]

In this connection, defendant relies upon the Supreme Court decision in *Omnia Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1922). The Court there makes clear that a contract (and the party's rights thereunder) constitutes property for purposes of the fifth amendment just as would any physical property such as land itself.

In that decision, the Court distinguished a "frustration" of a contract right (not viewed as a compensable taking) from an "appropriation" of a contract right (which might be viewed as a compensable taking). That distinction can best be understood by illustrations, albeit somewhat hypothetical.

---

**16.** Another example may be of assistance. If the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. (1982), were to be amended so as to suddenly regulate, and prohibit, the marketing and sale of tobacco products, the sellers of such products, like cigarettes, might sue for compensation for their unsalable stock. Those suppliers of such component items as, indeed, planted or harvested tobacco for imminent future supply would (again apart from specific supply contracts) be no more directly affected than if the retail industry itself (voluntarily) determined to cut-back sales or substitute non-tabacco products. Only if the government prohibited the growing of the substance could such suppliers claim, perhaps, a compensable taking. Plaintiff here has not shown any such prohibition upon *its* licensed activities.

**17.** At oral argument, in response to an inquiry by the court, counsel indicated that the complete terms of the contract are not now in the record. It is difficult to discern what rights if any NLI had under this contract; again, certain allegations by plaintiff are assumed for the purposes of the pending motion to be fact.

In the instant case, using the *Omnia* doctrine, the government might have "appropriated" NLI's rights under the contract if the government had asserted NLI's right to provide some transportation system to AGNS, in return for whatever consideration was offered by AGNS to NLI. In short, the government would have stood in the shoes of, or supplanted, a party to the contract. The government would have appropriated the contract for its own use or exercise and, had this occurred, plaintiff would be entitled to just compensation for a taking by the government.

On the other hand, the government might have "frustrated" the rights of the parties if it had conscripted, for its own use, the transportation services which NLI had produced (and had intended to furnish for AGNS' use under the contract), or had prevented the exchange of consideration from AGNS to NLI for such services, or had otherwise rendered impossible the performance of the contract. Under the *Omnia* doctrine, such government action would not constitute a compensable taking.

In short, the Court in *Omnia* held that if the contract itself were appropriated by the government (as where the government used the contract by stepping into the shoes of a party thereto), a compensable taking occurred. If, on the other hand, only the materials which were the subject of the contract were used by the government, thereby frustrating performance of the contract by any party thereto, no compensable taking occurred.

In the instant case, the situation does not fall clearly into either of these categories. The government assuredly did not appropriate NLI's rights under its contract with AGNS; the government did not seek to supplant itself as a party (particularly in substitution of the plaintiff NLI) to that contract. Thus, in the instant case, the circumstances which might have amounted to a taking, requiring just compensation, as enunciated in *Omnia*, are absent.

With respect to acts of the government which might frustrate NLI's contract with AGNS, the situation is somewhat more complex. Clearly, there was no *physical* interference with the materials which were the subject of the contract (such as conscription, for the government's use, of the transportation systems which were the subject of the private contract). Thus, in the instant case, the circumstances which were described in *Omnia* as constituting no compensable taking are likewise absent.

Rather, here, as plaintiff argues, the contract was frustrated, so to speak, by regulatory action by the government which demobilized the spent-fuel recycling industry, rendering useless, and impossible of performance, the contract between NLI and AGNS.

Plaintiff contends that this is a distinction with a difference. Specifically, plaintiff alleges that in *Omnia* the court found no compensable taking when "part of the [physical] means of performing the contract" had been interfered with (or conscripted) by the government. Here, however, the government "appropriated plaintiff's rights under its contract when, in its sovereign capacity, it flatly prohibited plaintiff and other companies from continuing their efforts ... to reprocess spent nuclear fuel ...." (Resp. br., Jan. 22, 1986, p. 10.)

Essentially plaintiff distinguishes between the government's exercise of (1) its sovereignty in conscripting, for public use, property which was the subject of a contract, thereby rendering performance of the contract impossible, as compared with (2) its police power in prohibiting, for the public welfare, certain transactions or activities which were the subject of a contract, thereby rendering performance of the contract impossible.

However, in either case, the action is more one of "frustration" than of "appropriation" of the contract for its own use (as by stepping into the shoes of a party to the contract)—which appropriation alone was recognized as a compensable taking in *Omnia*.

The doctrine, announced by the Supreme Court some 60 years ago, appears recited in innumerable decisions since that time. *See, e.g., Kearney & Trecker Corp. v. United States*, 231 Ct.Cl. 571, 576–77, 688

F.2d 780, 782–83 (1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 929 (1983). The Supreme Court decision in *Omnia,* and the rule announced therein, is binding on this court. No rule of thumb to the contrary has been cited to this court in any of the parties' arguments.

■ Accordingly, based on the foregoing, this court must conclude that there has been no compensable taking of NLI's contract with AGNS, based on the established doctrine of case law.

The responsibility of this court cannot end, however, with that pronouncement. However binding the *Omnia* doctrine may be, this court would be remiss if it did not point out certain curious features of that decision (and of the long line of cases which have followed it) in light of later decisions.

The Court, in *Omnia,* focussed on the government's use of the property, there the contract itself. The Court did not, at that time, recognize any taking where the government's lawful sovereign action merely frustrated performance of the contract (or, put another way, frustrated a party's use or enjoyment of the property, namely the contract). The Court echoed such sentiments as might be found in *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887).

For example, this court notes the following passages in *Omnia,* 261 U.S. at 508–09, 43 S.Ct. at 437–38:

There are many laws and governmental operations which injuriously affect the value of or destroy property—for example, restrictions upon the height or character of buildings, destruction of diseased cattle, trees, etc., to prevent contagion—but for which no remedy is afforded. Contracts in this respect do not differ from other kinds of property. *See Calhoun v. Massie,* 253 U.S. 170 [40 S.Ct. 474, 64 L.Ed. 843] .... This Court said [in *Calhoun*] (pp. 175–176 [40 S.Ct. at p. 476]):

"An appropriate exercise by a State of its police power is consistent with the Fourteenth Amendment, although it results in serious depreciation of property values; and the United States may, consistently with the Fifth Amendment, impose for a permitted purpose, restrictions upon property which produce like results." [Citations omitted.]

However, the case of *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1974), *reh'g. denied* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978), and many cases decided since that time, have recognized that a lawful government action, such as regulatory action or exercise of the police power, may be of sufficient extent as to constitute a compensable taking (as where, *e.g.,* it deprives an owner of any viable use of its property, taking into account such various factors as reasonable expectations backed by investment and foreseeability of the imposition of such regulatory scheme). *See, e.g.,* the *Monsanto* and *Bayview Homes* cases cited above.

By way of further example, in *Deltona, supra,* the Court of Claims addressed the very type of regulation referred to in the *Omnia* quote above, restricting the use to which land might be put during development. The court there stated that a compensable taking might occur in such circumstances (but held that such taking did not occur because the plaintiff was not deprived of all economically viable use of its land).

If, as the Supreme Court declared in *Omnia,* contracts are property like any other form of property, it might now be questioned whether indeed the government could, by regulatory action or the exercise of its police power, so extensively "frustrate" the purposes of a contract (or a party's right to perform thereunder) as to go beyond regulation and become a taking.[18]

Any conclusion that such a taking might occur, of course, does not merely go beyond *Omnia* but is inconsistent with it.

---

**18.** Although the Court determined that a contract was like any other property, in the context of the *Omnia* decision, it cannot be separated, by this court, whether the Court would hold likewise for purposes of a "regulatory taking".

Accordingly, it is not for this court to issue such pronouncement. Nor does this court, by this discussion, presume to determine whether the particular instant case would, now or at any other appropriate time, provide an adequate or appropriate vehicle for seeking the issuance of a writ or certiorari. Rather this court, merely adds its comments in and of the full, proper and responsible exercise of its jurisdiction, and with due deference to the proper jurisdiction of other courts.

### G. *Market Expectations*

Plaintiff contends that it was also deprived of its property in that it was deprived of its expected market, which expectations it backed with considerable investment. Defendant argues that this property, described as an expected market for its services in the reprocessing industry, cannot, as a matter of law, be viewed as property which may be the subject of a taking for which compensation is required. (Moving brief, pages 29–35; reply brief, pages 8–10.) In addition to describing this property as "market expectation", defendant also characterizes it as loss of anticipated profits or revenues. (Moving brief, page 27.)

Defendant includes in this argument a characterization of plaintiff's expectations as mere dreams or hopes. Defendant notes, firstly, that the existence of any reprocessing industry would require the granting of licenses and that the granting of such licenses could not be viewed as "automatic" or a foregone conclusion.[19]

Moreover, plaintiff's anticipated profits or revenues would be generated from its market expectations generally. Thus plaintiff here is unlike the plaintiff in *Monon-*

*gahela, supra,* whose anticipated revenues would result from a right, backed by law, to extract a toll under a franchise agreement.

■ This court would agree that, as a separate and clearly distinct property interest, plaintiff's market expectations (that is, lost anticipated revenues or profits) would not qualify as "property" within the fifth amendment. Unlike the plaintiff in *Monongahela* who had a legally enforceable right to collect tolls, plaintiff here, NLI, had no right enforceable by law to anticipated profits or revenues.

However, the court would also note that the value of existing physical property, and the licenses granted by the government, existing at the time of the alleged taking (beginning with the Presidential announcements and moratorium in 1977), if indeed a taking were to be found, would undoubtedly include a calculation for profitability just as it would for such other intangibles as good will. As the Court stated in *Monongahela,* 148 U.S. at 328, 13 S.Ct. at 627, "various elements enter into this matter of value" and among these elements are "demand for the use [of the property being taken]" as is further illustrated by the following passage:

> The commerce on the Monongahela River ... is great; the demand for the use of this lock and dam constant. A precisely similar property, in a stream where commerce is light, would naturally be of less value, for the demand for the use would be less. The value, therefore, is not determined by the mere cost of construction, but more by what the completed structure brings in the way of earnings to its owner.

---

**19.** It is indeed true that, pursuant to the terms of the applicable statute, a license was required and a procedure for obtaining a license was established. However, at the same time (and accepting plaintiff's allegations of fact as true for the purposes of this motion), the market was clearly projected to be widespread and vital throughout this century by, *inter alia,* the government itself which published such projections to further stimulate the participation of private industry in this enterprise. Thus, the anticipation of the granting of licenses and of the consequent existence of a vibrant reprocess-

ing industry can better be characterized not as mere *hypothetical dreams but rather as the* result of careful market analysis.

Moreover, defendant states that such market anticipation was "mere expectation". In taking cases, courts have long held that "mere expectations" are not property interests for purposes of the fifth amendment. However, expectations which are backed by investment do qualify as such property interests. Clearly here, and again assuming the correctness of plaintiff's factual allegations, plaintiff had made a substantial investment in this expectation.

Thus, while this court does not recognize the anticipated market to be a separate property interest which would require that lost profits or revenues be compensated, the court does not rule out the possibility of some measure of market in the valuation of plaintiff's physical property, if a compensable taking had been found here.

### Conclusion of Law

Based on the foregoing, it is determined that, assuming the correctness of all facts alleged by plaintiff, the complaint fails, as a matter of law, to set forth a claim for a Fifth Amendment taking for which compensation could be granted. Accordingly, defendant's motion is granted, and the complaint, Counts I and III, are to be dismissed. (Counts II and IV relating to breach of contract, remain pending and addressed in a separate motion.)

No Costs.

