**Paul J. SCARSETH, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 99–52C.

United States Court of Federal Claims.

March 27, 2000.

Edward A. Zimmerman, Burnsville, MN, attorney of record for the plaintiff.

Jonathan M. Coleman, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, and James M. Kinsella, Assistant Director, Commercial Litigation Branch, attorneys of record for the defendant. Lieutenant Colonel Terry L. Elling and Captain Arden B. Levy, United States Army Legal Services Agency, Litigation Division, of counsel.

#### OPINION

HORN, Judge.

In the above captioned case, plaintiff requests that the court void his discharge from the United States Army and award him full pay and allowances retroactive to the date of discharge together with costs and attorney's fees. The plaintiff alleges that he was involuntarily forced to resign from the Army. Defendant filed a motion to dismiss for failure to state a claim on which relief can be granted, arguing that plaintiff had cited no

money-mandating statute on which to base jurisdiction in this court, and that the issues raised by the plaintiff are non-justiciable. Subsequently, plaintiff filed an amended complaint, which the defendant opposes on the basis of "futility."

## FACTS

Some of the events described in the complaint are sparsely described and confusing, and neither party has supplied clarifying information. The complaint does reflect, however, that the plaintiff, Paul J. Scarseth, joined the National Guard in 1981, and the United States Army Reserve Officer Training Program in 1983. Mr. Scarseth was commissioned in the Army Reserves in 1984. In 1987, he joined the 400th MP (POW) Camp in Tallahassee, Florida. According to the plaintiff, he served as a reservist with that unit and its successor unit in Florida until April 1992.

In 1990, Mr. Scarseth moved from Tallahassee, Florida to Minnesota to care for his mother and sister. Mr. Scarseth, however, still attended monthly drills with the 400th MP unit in Florida. Pursuant to a request from Mr. Scarseth, the Unit Administrator changed his home of record to Hastings, Minnesota in his official files. In the fall of 1990, Mr. Scarseth's unit was placed on alert for mobilization to the Persian Gulf War. As a supply officer, Mr. Scarseth traveled to Florida on active duty orders to prepare for the mobilization. Mr. Scarseth's unit was activated in January of 1991 and operated in Saudi Arabia during a six month deployment. After returning, he states that he was discharged with an Honorable Discharge on July 1, 1991, but, according to the plaintiff, he continued to serve for ten additional months as a reservist. While on deployment, Mr. Scarseth states that he suffered permanent injury due to exposure to noxious fumes. Mr. Scarseth contends that he has a severe respiratory condition, and suffers from post-traumatic stress disorder, and depression. He is rated as 80 percent disabled by the United States Department of Veterans Affairs.

As indicated above, Mr. Scarseth maintains that he continued to serve as a reservist in the Army in Florida for the next ten months. Mr. Scarseth states that his unit asked him to stay on as the full-time Property Book Officer and Logistics Staff Officer, and he agreed to do so as long as the unit agreed to keep him on orders for a full year. During this time, plaintiff stayed with his brother's family in Gainesville, Florida. In the summer of 1991, subsequent to his honorable discharge from active duty, Mr. Scarseth alleges that he was told by his Unit Administrator that he could no longer list Minnesota as his home of record. Mr. Scarseth maintains that he, therefore, believed that his home of record had been changed back to Gainesville, Florida, and submitted paperwork accordingly. According to the complaint, however, and unknown to the plaintiff, this change actually never occurred.

In late 1991, the unit refused to continue Mr. Scarseth on orders. Despite being without orders, Mr. Scarseth continued to work from November 1991 until March 1992 on a volunteer basis for approximately twenty hours a week. Mr. Scarseth also complained to the Inspector General about his unit breaking the agreement to place him on orders for a full year and about other matters involving fraud. The Inspector General dismissed Mr. Scarseth's complaints. Mr. Scarseth then complained to the Commanding General of the 81st Army Reserve Command, who referred the matter back to the Inspector General. Mr. Scarseth states that he received no response to his complaint. Subsequently, plaintiff had a confrontation with the Unit Administrator, who, according to the plaintiff, accused him of laziness and threatened him with a hammer.

According to the plaintiff, following the confrontation with the Unit Administrator, different personnel began to raise questions about his home of record. Plaintiff gave them his brother's Florida address, believing that the personnel were asking for his temporary local address, not his official home of record. Subsequently, investigators from the Army Criminal Investigation Division questioned him regarding allegations that he had claimed the wrong home of record and that he had submitted improper travel vouchers. Mr. Scarseth states that he denied

these allegations and offered evidence to explain and justify the basis for the travel vouchers he had filed.

Mr. Scarseth states that he subsequently returned to Minnesota to care for his invalid mother. According to the plaintiff, while in Minnesota, he contacted the legal office assigned to provide legal services to reservists in his unit, but he was informed they could not assist him regarding the Army criminal investigation. Mr. Scarseth also maintains that while in Minnesota he wrote to the Inspector General, but received no response.

The Defense Finance and Accounting Service (DFAS) wrote Mr. Scarseth demanding repayment of $4,405.81. After an accounting, this claim was reduced to $1,083.82. Although Mr. Scarseth contested the overpayment, he agreed to repay the amount by drilling with a Minnesota Reserve unit and assigning his drill pay to the DFAS. Mr. Scarseth had repaid all but $374.09 of the claimed overpayment by November of 1993 when he became too ill to continue drilling with the Reserve Unit. Before Mr. Scarseth could recover and make the last payment, according to the plaintiff, his former commander brought court-martial charges against him, and he was ordered to Fort McPherson to appear at an investigation pursuant to Article 32 of the Uniform Code of Military Justice.

Captain Kevin Govern was appointed as defense counsel to Mr. Scarseth. According to the Mr. Scarseth, Captain Govern communicated by mail with the plaintiff and appeared reluctant to assist in planning an aggressive defense. Instead, he counseled Mr. Scarseth to resign in lieu of court-martial, even before he had met with Mr. Scarseth or, according to the plaintiff, had reviewed his defenses. Indeed, the complaint provides a litany of incidents in which, according to plaintiff, Captain Govern and the government prosecutor, Captain Arnold, pressured plaintiff to resign rather than proceed with the court-martial.

Subsequently, according to the plaintiff, plaintiff agreed on March 3, 1994, to submit resignation papers, because plaintiff felt that Captain Govern would not assist him. The plaintiff was discharged under other than honorable conditions from the Army on July 21, 1994, and the Army Discharge Review Board denied his appeal, challenging the lawfulness of his discharge.

Plaintiff contends that he did not receive effective assistance of counsel and that Captain Govern's actions and the resignation process violated multiple Army regulations. Plaintiff has further asserted that at the time he resigned, he was in extreme emotional distress, and undergoing psychiatric treatment for depression and Post Traumatic Stress Disorder. He argues that his resignation was coerced and not voluntary, and suggests that at the time of his resignation he may not have been mentally competent to submit voluntary resignation papers. There also are allegations in the complaint that plaintiff tried to withdraw his resignation, which were not addressed by the Army. Plaintiff also alleges that the general court-martial convening authority never reviewed the record to determine whether his request for resignation was voluntary as is required under Army regulations, and that the Army Discharge Review Board also failed to address the issue of voluntariness of his resignation in lieu of court-martial. In addition, according to the plaintiff, when his record was sent to the Army Discharge Review Board, it was incomplete. Thus, the plaintiff attacks the decision of the Army to discharge him and to deny his appeals of that discharge as arbitrary and capricious.

## DISCUSSION

### I.

Plaintiff filed a motion to amend the complaint on November 4, 1999, which included among other requests, permission to change the authority to award back pay from the Back Pay Act, 5 U.S.C. § 5596 (1994), listed in his earlier complaint, to the section of the Military Pay Act applicable to active duty service members, 37 U.S.C. § 204 (1994). Under Rule 15(a) of the Rules of the United States Court of Federal Claims (RCFC), permission to amend a complaint shall be "freely given when justice so requires." Given the manner in which this rule has been broadly interpreted, even though this is plaintiff's

second amendment of the complaint, the court will allow the plaintiff to amend the complaint. *See Foman v. Davis*, 371 U.S. 178, 181–82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (interpreting similar rule in the Federal Rules of Civil Procedure).

## II.

Currently before this court is defendant's motion to dismiss pursuant to RCFC 12(b)(4) for failure to state a claim upon which relief can be granted. Defendant argues that the plaintiff has cited no money-mandating statute on which to base jurisdiction in this court, and that the issues raised by the plaintiff are non-justiciable. When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996) (Table). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746; *Alaska v. United States*, 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States*, 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

In order for this court to have jurisdiction over plaintiff's complaint, the Tucker Act, 28 U.S.C. § 1491 (1994 & Supp. III 1997), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980) (*Mitchell I*); *United States v. Testan*, 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc*), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v.*

*Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*) (citing *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

This court's predecessor, the United States Court of Claims, articulated the jurisdiction of this court, pursuant to 28 U.S.C. § 1491, in *Eastport Steamship Corp. v. United States,* as follows:

> Section 1491 of Title 28 of the United States Code allows the Court of Claims to entertain claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort". But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money.

*Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 605, 372 F.2d 1002 (footnote omitted).

### A.

■ In the above-captioned case, the defendant has moved to dismiss the plaintiff's complaint for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(4). Defendant contends that plaintiff was not in full-time active service when he was discharged and, therefore, lacks a pay-mandating provision with which to seek back pay. The plaintiff responds by stating that, because he was placed on full-time active duty when the Army ordered him to Fort McPherson to appear at an Article 32, Uniform Code of Military Justice investigation into court-martial charges, he is entitled to recover back pay under the pay-mandating provision of the Military Pay Act, 37 U.S.C. § 204. For the purposes of deciding this motion to dismiss, taking plaintiff's facts alleged in the complaint to be true and construing them favorably to the plaintiff, the court concludes that plaintiff was in full-time active service, however briefly, when he resigned. Determination of whether the plaintiff may be entitled to some amount of back pay for the length of his active duty service is reserved for further proceedings.

The sole issue before this court is whether plaintiff was on full-time active duty when he was discharged. If plaintiff was in full-time active service, he may lay a claim to mandatory back pay under 37 U.S.C. § 204. If plaintiff was not in full-time active service, he may not lay a claim to back pay under 37 U.S.C. § 204. This distinction applicable to military service members who claim back pay from the United States was clearly and fully articulated by the United States Court of Appeals for the Federal Circuit, in *Palmer v. United States:*

> The military pay statutes, the military's administration of those statutes, and this court's precedents recognize that there are two basic categories of pay entitlements for military service. One category relates to service members serving on full-time active duty. This includes those members for whom service is a professional career, as well as those individuals, following in this country's tradition of the citizen-soldier, who though not initially trained as professionals serve their country full-time. For purposes of pay, the statutes treat both the professional and the citizen-soldier alike. By virtue of their status, arising from full-time active duty service, they are entitled to the pay and allowances attributable to their rank and station. *See* 37 U.S.C. § 204(a)(1) (1994) ("The following persons are entitled to the basic pay

... a member of a uniformed service who is on active duty...."). If they are wrongfully denied the benefits of that status, they have a cause of action under the Tucker Act; section 204(a)(1) is money-mandating. *See, e.g., Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.1997); *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 810–11 (1979) (en banc).

The second category of pay entitlement for military service relates to those persons not in full-time active duty service. These members are invariably attached to one or another Reserve entity. Some Reserve units provide pay billets for their Reserve officers, others do not. A pay billet usually means that the officer is obligated to engage in some number of drills each year—some units drill one evening a week, some one or two weekends a month—as the particular service activity may require. *See* 10 U.S.C. § 270(a)(1) (1988) (recodified at 10 U.S.C. § 10147(a)(1) (1994)). In addition, Reservists in a pay billet typically perform a period of active duty for training each year, usually of two weeks duration. *See id.* Members in such pay billets are paid by the military only for drills actually attended, *see* 37 U.S.C. § 206(a)(1) (1994), and for active duty for training actually performed, *see* 37 U.S.C. § 204(a)(2) (1994).

The consequence of this difference in pay entitlement between full-time active duty personnel and those serving part-time reserve duty is that a member who is serving in part-time reserve duty in a pay billet, or was wrongfully removed from one, has no lawful pay claim against the United States for unattended drills or for unperformed training duty. *Cf. Dehne v. United States,* 970 F.2d 890, 894 (Fed.Cir. 1992) (finding that the combination of 37 U.S.C. § 206(a) and 10 U.S.C. § 1552(c) fails to establish a right to back pay for constructive service by a National Guard officer who was transferred from active service to the reserves); *Banks v. Garrett,* 901 F.2d 1084, 1087 (Fed.Cir.1990) (concluding that Banks was not entitled to back pay under either 37 U.S.C. §§ 204(a) or 206(a)(1) because he performed no reserve unit drills after his lawful transfer). This is true whether the failure to drill was by election of the member, or by decision of the service involved.

*Palmer v. United States,* 168 F.3d 1310, 1313–14 (Fed.Cir.1999).

In the above captioned case, the plaintiff was ordered to full-time active duty solely for the purpose of proceeding with a court-martial.[1] There is scant precedent regarding the precise question at issue, whether ordering a service member to full-time active duty solely for the purpose of court-martial is sufficient to entitle that member to compensation under 37 U.S.C. § 204. The statute, as is clear from the plain language contained therein, does not by its terms exclude reservists ordered to active duty solely for the purpose of court-martial from pay under 37 U.S.C. § 204. Rather, the statute provides that a service member "who is on active duty" is entitled to pay, 37 U.S.C. § 204(a)(1), and that "[a] member of a reserve component of a unformed service is entitled to pay and allowances ... whenever such member—(1) is called or ordered to active duty for a period of more than 30 days," 37 U.S.C. § 204(g)(1). Plaintiff's complaint alleges that plaintiff was in full-time active service for an indefinite period. [Compl. at 60]. If plaintiff had not resigned, he would have remained in full-time active service until the date of the final disposition of his court-martial or his return to reserve status. *See* Rules for Courts–Martial 204(b)(1). For some part of the period of time claimed, plaintiff would have been in full-time active service and, thus, possibly entitled to back pay under 37 U.S.C. § 204.[2]

---

**1.** The Army has the authority to order reservists to full-time active duty for an Article 32 investigation pursuant to 10 U.S.C. § 802(d)(1)(A) (1994). Indeed, in order to proceed with a court-martial, the Army must order a reservist to full-time active duty in order for the Department of Defense to have jurisdiction over the reservist. *See* Rules for Courts–Martial 204(b)(1) (1998) ("A member of a reserve component must be on active duty prior to arraignment at a general ... court-martial."); *see also Graham v. United States,* 36 Fed.Cl. 430, 433 (1996).

**2.** *Of course, merely because plaintiff would have been on active orders for part of the time he claims does not mean that he is entitled to*

Thus, plaintiff properly has invoked 37 U.S.C. § 204, a money-mandating statute, vesting jurisdiction in this court.

### B.

Defendant also claims that the plaintiff's complaint is non-justiciable. Traditionally, courts have accorded deference to the personnel decisions of the military and have been reluctant to interfere with the authority of the executive in military and national security affairs. *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). An oft repeated theme in military pay cases is that "[t]he merits of a service secretary's decision regarding military affairs are unquestionably beyond the competence of the judiciary to review." *Adkins v. United States,* 68 F.3d 1317, 1322 (Fed.Cir.1995), *reh'g denied* (1996). Expanding on this theme, the United States Court of Appeals for the Federal Circuit has stated:

> Justiciability is distinct from jurisdiction; it depends on "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Justiciability is a particularly apt inquiry when one seeks review of military activities.

> [J]udges are not given the task of running the Army. The responsibility for setting up channels through which [ ] grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Murphy v. United States,* 993 F.2d 871, 872 (Fed.Cir.1993), *reh'g denied* (1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994), *reh'g denied,* 511 U.S. 1118, 114 S.Ct. 2123, 128 L.Ed.2d 681 (1994) (quoting *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953), *reh'g denied,* 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953)).

■ At the same time, "[t]his court has consistently recognized that, although the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy." *Adkins v. United States,* 68 F.3d at 1323. As stated in *Murphy v. United States:*

> When the military is given unlimited discretion by Congress, it is nevertheless bound to follow its own procedural regulations if it chooses to implement some. *Sargisson[ v. United States],* 913 F.2d [918,] 921 [(Fed.Cir.1990)]. But the utility of the distinction between procedural and substantive matters in assessing a court's ability to review military decisions should not be overemphasized. On procedural matters, the test or standard is inherent. A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion. The court is not called upon to exercise any discretion reserved for the military, it merely determines whether the procedures were followed by applying the facts to the statutory or regulatory standard.

*Murphy v. United States,* 993 F.2d at 873. Likewise, in *Sargisson v. United States,* the court stated that, "once the Secretary promulgated regulations and instructions and made them the basis for [the service member's] release, his action became subject to judicial review for compliance with those regulations and instructions, even though he was not required to issue them at all." *Sargisson v. United States,* 913 F.2d at 921. The court

---

back pay for all of the time period in question. The issue as to how much back pay, if any, might be due plaintiff is reserved for trial for further proceedings regarding, for example, the voluntariness of his resignation or the allega-

tions regarding the effectiveness of his counsel, and documentation regarding plaintiff's active duty orders and what, if any, amounts have previously been paid to the plaintiff.

in *Voge v. United States* offered similar guidance, stating that, "[i]t has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all. . . ." *Voge v. United States*, 844 F.2d at 779. Consequently, a controversy is justiciable only if it is "one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence." *Id.* at 780 (quoting *Greene v. McElroy*, 254 F.2d 944, 953 (D.C.Cir.1958), *rev'd on other grounds*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)).

■ In the amended complaint, plaintiff alleges that his "discharge from the United States Army was unlawful because the Army failed or refused to follow its own regulations." He also asserts broadly that the decision of the United States Army Discharge Review Board was arbitrary and capricious and not based on fact or law, namely, because the Board failed to review pertinent evidence. These are the type of allegations that the United States Court of Appeals for the Federal Circuit has found to be justiciable. *See Adkins v. United States*, 68 F.3d at 1325.

In addition, plaintiff's claim raises issues regarding the voluntariness of his resignation. It is clear that this court and the United States Court of Appeals for the Federal Circuit have repeatedly reviewed this type of claim. Recently, in *Moyer v. United States*, 190 F.3d 1314 (Fed.Cir.1999), the court stated that "[t]he Court of Federal Claims plainly had authority to consider [plaintiff's] allegation of involuntary resignation. . . ." *See id.* at 1319 (discussing an Army officer's claim that his resignation was involuntary due to the misrepresentation or deception on the part of government officials).

Indeed, when an officer is tendering a resignation for the good of the service, the Army has prescribed specific regulations for ensuring that the resignation is voluntary and not coerced. *See* Army Regulation 635–200, ¶ 10–2 (1989). Those regulations state that:

    a. Commanders will insure that a soldier will not be coerced into submitting a request for discharge for the good of the Service. . . .

    b. Consulting counsel will advise the soldier concerning—

    (1) The elements of the offense or offenses charged.

    (2) Burden of proof.

    (3) Possible defenses.

    (4) Possible punishment.

    (5) Provisions of this chapter.

    (6) Requirements of voluntariness.

    (7) Type of discharge normally given under the provisions of this chapter.

    (8) Rights regarding the withdrawal of the soldier's request.

    (9) Loss of Veterans Administration benefits.

    (10) Prejudice in civilian life because of the characterization of the discharge. . . .

*Id.* Plaintiff alleges that the General Court–Martial commander never reviewed his case for voluntariness and that neither Captain Govern, his assigned defense counsel, or any other person, properly counseled plaintiff regarding any of the required elements outlined in Army Regulation 635–200, paragraph 10–2(b). Thus, plaintiff alleges that the Army has violated a number of its own regulations, a clearly justiciable issue.

## CONCLUSION

For the above stated reasons, the plaintiff's motion to amend the complaint is **GRANTED** and the defendant's motion to dismiss is **DENIED.** The extent to which, if any, the plaintiff is entitled to damages will be adjudicated in further proceedings to be scheduled by separate order.

**IT IS SO ORDERED.**